DECISION AND JUDGMENT
{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas following a jury verdict finding appellant guilty of murder and aggravated robbery. Because we conclude that the indictment was not defective, and the trial court committed no reversible error, we affirm. *Page 2 
 {¶ 2} Appellant, Christopher S. Mason, was indicted on two counts: Count 1-aggravated murder, in violation of R.C. 2903.01(B) and (F), and Count 2-aggravated robbery, in violation of R.C. 2941.145, along with firearm specifications for each count, in violation of R.C. 2941.145. The charges stemmed from incidents involving the fatal shooting of Rodney Coley, a Lucas County resident. Appellant pled not guilty to both counts and specifications. At a jury trial, the following evidence and testimony was presented.
 {¶ 3} Several witnesses first testified regarding the apprehension and arrest of appellant at a home located in western Lucas County. Fulton County Sheriffs Deputy Aaron Gladieux testified that on February 2, 2006, he was traveling west on Frankfort Road, en route to talk to a Fulton County resident who had been the victim of one of several house break-ins. The deputy observed a green SUV without a front license plate driving toward him and turned his vehicle around to stop the vehicle. When he saw that it had pulled into a driveway and no one was in the vehicle, he decided to continue on to his original destination. He then observed the SUV pull out of the driveway and head east.
 {¶ 4} The deputy decided to turn around and initiate a traffic stop when he saw the SUV again pull into another house and one person leave the vehicle. He also saw three black males at the corner of the house. As the deputy pulled into the driveway, one man approached him, one ran south out of the yard, and the third ran around the house to the west. Ultimately, all three men were apprehended. *Page 3 
 {¶ 5} The deputy then identified a photo depicting the SUV in front of the house which was located in Lucas County. He stated that when he ran the license plate, it belonged to a different vehicle, indicating that the SUV was stolen. The deputy then identified appellant as one of the men from the SUV, who was arrested on the west side of the house.
 {¶ 6} The next witness, Detective Mark Woodruff from the Lucas County Sheriffs Department, testified that he arrived at the Frankfort residence on February 2, 2006, at about 11:00 a.m., after appellant had been arrested and taken into custody. He investigated the scene of an alleged attempted break-in, took photographs of the house and vehicle, and identified those photographs in court, which were admitted as exhibits. The detective also identified photos of a bag containing six rounds of ammunition. The bag was found on the ground next to a screen porch. In addition, a .357 caliber handgun, was found outside in a basement window well. The detective also confirmed that the SUV in the driveway was stolen.
 {¶ 7} Detective Woodruff said he had spoken with the homeowner who said he did not know the three men. The detective left the scene, but was later called by the homeowner who had found a .38 Taurus revolver in a dog food bag in his garage. The detective identified state's Exhibit 36 as the handgun he recovered from the homeowner.
 {¶ 8} The next witness, Dan Paulus, a Wood County resident, testified that he and his family were out of town for the day on February 1, 2006. When they all returned home at 6:30 p.m., they noticed lights on in the house. Upon opening the garage door, he *Page 4 
saw that the inside garage door to the house was open and their Ford Expedition had been stolen. Paulus then identified the Expedition in photos where it had been parked in the driveway of the Frankfort home and noted that the license plate on the vehicle was not his plate. He stated that he had not given anyone permission to drive his vehicle, but acknowledged that he had no idea who had stolen it, and did not know appellant. Paulus stated that when the vehicle was returned to him, after impoundment and processing by the police, it was a "mess," including someone else's shoes, drinks, and cigarette butts.
 {¶ 9} The following witnesses then presented testimony and evidence regarding the fatal shooting of Rodney Coley. Toledo Police Officer, Brian Bortel, testified that on February 1, 2006, he and two other police units arrived at Coley's residence at 2736 Bryn Mawr Street, Toledo, responding to a 911 call reporting gunshots heard. When nobody answered the door, police left and searched the neighborhood, but found no evidence or witnesses. Minutes after the police left that location, another 911 call was received from that address, reporting that a man had been shot. The officers immediately returned, entered the home, and found Coley dead, lying face down on the living room floor. The officers then secured the scene. Shortly after, the Toledo Fire Department arrived and rolled over the victim's body, revealing that he had been shot.
 {¶ 10} Chad Culpert, a Toledo Police Department ("TPD") crime scene investigator, next testified that he responded to the scene at Bryn Mawr, in Lucas County, Ohio. He said that he photographed the crime scene, identifying 16 photo exhibits, and measured certain areas, such as the front porch, the threshold of the front door, and *Page 5 
various interior measurements of walls and the fireplace area. He then created a rough sketch to an approximate scale, from which a diagram was produced for trial.
 {¶ 11} Culpert also noted that the entrance to the victim's residence had two doors, a storm screen door, and a solid inner door with panes of glass. He stated that three bullets had passed through only the inner door. One struck the floor close to the door. Another crossed the living room and struck the back wall of the fireplace. The third struck the victim. Culpert stated that after he photographed the scene, he and another investigator, Detective Schriefer, began documenting and collecting physical evidence from the scene. Schriefer also fingerprinted the inside face of the exterior storm door.
 {¶ 12} Culpert then stated that Officer Irma Oberneder, a uniformed officer, assisted the emergency medical technicians ("EMT") when they rolled the victim over to his back to treat him. At the request of an EMT, Oberneder removed from the victim's belt line, a holster which was snapped closed and contained a firearm. Culpert stated that he recovered that gun, which was presented as Exhibit B. He then identified three damaged bullets which were recovered from the living room floor near the victim, inside the fireplace wall, and the floor near the front door.
 {¶ 13} Culpert stated that the screen door was open when the shots were fired, since that door had no damage or holes, and the inner door was shut. The holes in the inner door were at 11 inches, 42 inches and 51 inches from the floor. Culpert said he used a dowel rod placed in the holes in the door to determine that the two bullets which struck the floor and the fireplace entered in a downward trajectory. Although he could *Page 6 
not tell for certain which shots were fired first, he stated that the normal tendency is for a gun to rise somewhat through successive shots. The level of the gun then changes for each shot. In this case, even though the holes rose in height, the trajectories are all in a downward pattern, indicating that although the gun may have risen as it was fired, it was being held so that it fired down into the door.
 {¶ 14} Toledo Police Detective Scott Smith testified that he interviewed appellant on July 17, 2006. After Mirandizing appellant, Smith asked appellant about what had happened at the Bryn Mawr residence. Appellant said that James Harris had shot Rodney Coley. Initially, appellant told Smith that Harris, Dante Boone, and he had gone to Coley's just to buy some "weed" and there was never any plan for a robbery. Appellant said they knocked on the door and, when there was no answer, he started to leave the porch. He said he then heard the door open, the door slam, and three shots that Harris fired from his gun into the door. Appellant said the he and Boone were also armed.
 {¶ 15} Later in the interview, however, Smith acknowledged that earlier in the evening, Boone said that Coley had garbage bags full of weed and they could "go hit a lick," meaning steal the marijuana. Appellant said at that point he told the other two that he did not want to be involved in a robbery and to drop him off at his girlfriend's house. He said he told the others to "calm it down," and that he went with them because the robbery was not supposed to happen. Appellant, however, further acknowledged in the interview, that no one actually said they were calling off the robbery. *Page 7 
 {¶ 16} Next, Toledo Police Sergeant Paul Armola testified that he also reported to the scene of the shooting when the 911 call of shots fired came in. When he arrived, police were already on the scene. As he entered the house, he observed that the screen door was open because the pneumatic closer was bent. He also saw a bullet hole through the glass in the inner front door. When he entered the residence, he saw several children, including a teenager who was "somewhat emotional."
 {¶ 17} Sergeant Armola also observed the victim's holster containing a .45 caliber, semi-automatic Bersa handgun lying on the floor near the body. He said that this type of gun was not the usual, cheap, Saturday night type of weapon commonly used by criminals.
 {¶ 18} Dr. Cynthia Beisser, Lucas County Deputy Coroner, testified as to the autopsy performed on the victim. She testified that Coley died from a single gunshot which entered the upper right side of his chest, through the upper lobe of the right lung. The bullet traveled downward in a straight path, crossing the victim's midline, and then through his heart, esophagus, and left lung, exiting out the left side of his back. She identified and discussed various autopsy photos which were published to the jury.
 {¶ 19} David Cogan, laboratory administrator, testified that he tested two recovered revolvers, a Smith Wesson .357 magnum and a Taurus .38 special, to determine operability and if either weapon fired the bullet projectiles found at the scene of the murder. Cogan determined that two of the projectiles found at the murder scene *Page 8 
were fired from the Smith Wesson . 357 magnum revolver. He could not determine the weapon that fired the third recovered projectile because it was too damaged.
 {¶ 20} Detective Gerald Schriefer, a Toledo Police officer then testified that he assisted in the investigation at the scene of the murder. He assisted with taking measurements, found one of the bullet projectiles on the floor, examined the victim to determine entrance and exit wounds, took some photographs, collected some items from the basement, and processed the front storm door for fingerprints. He stated that he was able to lift one latent fingerprint from the inside of the door which he later identified as belonging to the shooter, James Harris.
 {¶ 21} Linsey Hail, an Ohio Bureau of Criminal Identification and Investigation laboratory technician, testified as an expert witness in DNA analysis. After discussing DNA analysis generally, she testified that she tested the two revolvers recovered during the investigation. Her test results indicated that defendant Harris could not be excluded as the major source of DNA on the handle of the Smith Wesson .357 magnum and that appellant could not be excluded as the source of DNA on the .38 caliber handgun. She acknowledged that appellant's DNA was not found on the Smith Wesson, the weapon which allegedly killed Coley.
 {¶ 22} The next witness, Rodney Coley, Jr., the victim's sixteen-year old son, testified as to what he observed on the night of the shooting. He said he and his two younger brothers lived with their father who was 35 years old and worked as a truck driver for the city of Toledo. He said his father was home when he arrived home from *Page 9 
school at approximately 4:00 p.m. The son said that his father left the house and came back several times that afternoon. The son said when his dad returned to the house with a man named "Antonio," they all watched a movie in the basement. After it was dark, Coley Sr. left with Antonio and then returned home alone. After watching the movie, Coley Jr. then went to his brother's room, which was upstairs at the back of the house, away from the front porch area.
 {¶ 23} Coley Jr. then said his father made a telephone call and told his sons to go to bed. The son said they all went up to their rooms, but did not go to sleep. After his dad came back the last time, he heard a quiet knock. The knock then got louder, "like the police bamming real loud." Coley Sr. ran up from the basement and answered the inside front door, asking who it was. Coley Jr. said someone asked if a certain person lived there, and his dad said "no" and that he did not know anyone by that name. The son heard some fidgeting with the front door knob, some whispering, and then a scuffling sound of someone trying to get in and the inside door opening. He heard the door quickly closed and locked, and then the gunshots. He then called the police.
 {¶ 24} Coley Jr. said he stayed upstairs the first time the police came to the house because he did not know if anyone was still in the house. The second time the police came, he saw the motion detector light come on at the back of the house and two police officers, and he came downstairs. He said that the porch light did not work and was not on that night. *Page 10 
 {¶ 25} Coley Jr. said he recognized the name of Dante Boone and that Boone had been to his house previously. He said he did not know appellant or Harris. On cross-examination, however, he said he thought appellant was Dante Boone. He then said he knew appellant, not Boone. Coley Jr. said he did not hear anyone ask to buy "weed," and said he never saw his father sell marijuana or saw any garbage bag full of "weed" around the house.
 {¶ 26} The next witness, Detective James Scott, with the Toledo Police Division, testified that he also investigated the Coley murder. When he arrived at the Bryn Mawr residence, he helped to secure the crime scene and looked for evidence outside the house. The next day, February 2, 2006, Detective Scott went to the police station at 10: 48 p.m. and, along with another detective, spoke with appellant, whom he identified in court. Detective Scott said that, after being advised of his rights, appellant waived them and answered questions about the murder. The interview lasted approximately 45 minutes. Detective Scott testified separately as to what appellant said, and the videotaped interview was also played for the jury.
 {¶ 27} Detective Scott testified to the following statements made by appellant during the interview. Appellant said that at about 3: 00 p.m. on the day of the shooting, he had been hanging out with his "bros," James Harris and Dante Boone. They had been at a house with some girls, and he ended up riding out in the country in a stolen green Expedition SUV. He first denied being at Coley's residence, but then admitted that he, Harris, and Boone had gone there to buy marijuana. He acknowledged that Harris and *Page 11 
Boone had said they should "rob him for some weed," because all three men had guns. Appellant said he himself was "strapped" with a "dark color .38" and" his Bro had the chrome .357." He denied any intention to kill anyone and said that he did not pull his gun out. Appellant called the victim "Rodney" but said that Boone knew him.
 {¶ 28} Appellant said that he had gone to the door with Harris and knocked several times. Appellant then turned and walked away, hearing gunshots behind him. He ran back to the SUV, along with Boone, who had been standing out on the sidewalk approximately 15 to 20 feet away. Appellant continually denied seeing the actual shooter but, based on the sound of the gunshots, surmised that Harris had fired his .357 magnum. Appellant said that they left the area.
 {¶ 29} Appellant said that Harris, Boone, and he were together again the next morning, with Harris driving the stolen SUV "out in the country." Appellant said they were out on the Frankfort Road when a police car went by and then turned around. They pulled into a driveway and exited. Appellant first denied having a gun at that time, but then admitted that they left the vehicle and tried to hide the guns that they were carrying. Appellant said the police car drove by, but turned around and came back. When the plates were run, the police then took all three into custody. Although he admitted that he was with Harris who had killed Coley, he consistently claimed that he was only there to buy "weed" and never had any intention of robbing or hurting Coley.
 {¶ 30} The next witness, Dante Boone, one of the co-defendants, acknowledged that he agreed to testify as part of a plea agreement with the prosecutor. That agreement *Page 12 
was for him to plead to "murder B, 15 to life" and, in return, all other charges, including aggravated robbery, would be dropped. Boone stated that he knew appellant from hanging around the Brand Whitlock apartment complex. He also knew Harris for about a year and a half through another friend. Boone said he had only hung out with Harris and appellant "every now and then" or "like just a couple times."
 {¶ 31} Boone testified that, on the night of the shooting, he was at a friend's house for a party at about 7:00 p.m. He said that he and Harris talked about "hitting a lick," i.e., robbing Coley and taking his marijuana. Boone knew Coley and had been at his home about five times prior to that evening. He told Harris that Coley had shown him a large amount of marijuana in his garage which led him to think that Coley probably had "a lot of money." Boone said that a couple weeks prior to the party, he and Harris had talked together about robbing Coley for his "weed." Boone testified that appellant was not in on either conversation, but was at the party and likely overheard the discussion on the night of the shooting.
 {¶ 32} Boone testified that he was carrying a weapon, but he did not know when they left the party whether appellant or Harris had weapons. Boone identified a .22 revolver as the weapon he had in his pants that evening and that it was loaded with nine bullets in the cylinder. Boone also identified a .357 magnum handgun as the weapon carried by Harris and a .38 handgun as the weapon carried by appellant when they went to Coley's home. He said all three were carrying weapons "in case something went wrong" or a fight occurred. *Page 13 
 {¶ 33} Boone said the three men left the party around 10:15 in the Ford Expedition, driven by Harris. Boone sat in the front passenger seat. They traveled to near where Coley lived and parked the vehicle around the corner so Coley would not see it. They all got out of the vehicle and walked toward the house. Boone stayed back from the house out on the sidewalk, fearing that Coley would recognize him, while Harris and appellant walked up to the front door which was not lighted. Boone said he saw appellant knock on the door and Coley answered. Appellant asked if "Ashley" lived there, and Coley said "no" and shut the door. Boone said he saw that Coley was holding a gun down against his right hip. After the door shut, Boone said appellant then turned and walked back toward the sidewalk. At that moment, Harris shot through the door of the house with the .357 magnum.
 {¶ 34} Boone testified that they all ran back to the SUV and left. The three were apprehended and taken into custody the next day by the Fulton County sheriff deputies, near the house on Frankfort Road. Boone said he talked with detectives about the shooting, because he did not want to be charged with murder. Despite being charged, however, Boone stated that the three never talked about "calling it off at any time prior to arriving at Coley's home. Boone also identified a letter that appellant had sent him while they were both in jail awaiting trial. The letter described appellant's version of the events, with appellant stating that "we got to stick together and get our stories straight because James [Harris] start his trial before us." At the end, appellant instructed Boone to write back and then tear up the letter. *Page 14 
 {¶ 35} The prosecution then rested. Appellant moved for a Crim. R. 29 acquittal which was denied.
 {¶ 36} Appellant then testified in his own defense. He said he was friends with James Harris and Dante Boone, but had only known them for a year and an half. He stated that on the night of the shooting, he was carrying a gun for "protection." Appellant said he had been robbed several months earlier, so he began carrying a gun, unless he was going to work. He also acknowledged that he smokes marijuana. On the night of the shooting, he and Harris got together and went to a party at an apartment. Boone was also at the party. Appellant said he saw Boone and Harris talking together but he did not hear the conversation. Boone then told him that he knew someone who had some "weed" and Boone referred to a "lick," meaning to steal or rob someone. Appellant said he told the others "we ain't hitting no lick." The three men decided to drive to get some marijuana, and, according to appellant, nothing more was ever said about "hitting a lick."
 {¶ 37} Boone directed Harris who was driving, to Coley's home, where appellant was allegedly going to buy marijuana. Appellant confirmed that they parked the SUV around the corner from Coley's house and walked up to the front door. Appellant said he walked up to the porch first, with Harris behind him. Boone stayed on the sidewalk. Appellant then knocked on the door several times. When no one answered, appellant said he turned and started back down the steps. Just then, Coley opened the door slightly, and appellant turned around. Appellant said Coley and he had "dealt" before, so he asked for *Page 15 
"some green." Coley said he was not selling anything that night, and appellant turned away from the door.
 {¶ 38} Appellant said that as he left the porch, he pulled out his cell phone to try to find another dealer. Harris was still standing on the porch. Appellant said his back was to the door when he heard shots fired. He said he ducked down and started running because he was scared and did not know who was shooting. He and Boone ran to the SUV, with Harris right behind them. They got in the vehicle and Harris told appellant he had done the shooting. Appellant said he asked why, but was unaware at that time that Coley had been shot.
 {¶ 39} Appellant stated that it was never his intention to rob or shoot Coley. He said that the three men then drove back to a housing development where he separated from Harris and Boone and went to a girlfriend's residence. The next morning, Harris called and picked him up to ride to some other girls' house out "in the country." Appellant, Harris and Boone then drove out to Frankfort Road, where a police car pulled up behind them. Harris pulled into a driveway and said he did not want to drive anymore because the SUV was stolen. Since they were all still carrying guns, they jumped out of the vehicle, ran, and tried to hide them at the house where they were stopped. Appellant said that the first time he knew Coley had been shot was from a "chirp" from Boone's walkie-talkie cell phone, just before the three were taken into custody.
 {¶ 40} Appellant acknowledged that after he was arrested, he talked with two police detectives, but lied at first about being at Coley's house. He stated he never told *Page 16 
the "whole story" because the detectives kept saying he was lying and cut him off when he tried to explain what happened. He also said he had offered to take a lie detector test, to show he was not involved with the robbery. When appellant told the detective he thought he "had it calmed down," appellant believed the other two men no longer had any intention of robbing anyone. Appellant also acknowledged writing a letter to Boone, but said it was to urge him to tell the truth. Contrary to what Boone had said, appellant said he was never on the porch when Coley came to the door. Rather, he said he was leaving and talked to Coley from farther away from the porch area. Appellant said he had never been involved in breaking and entering, burglaries, or robberies. He said he did not actually see Harris fire the shots. Appellant said he thought someone was shooting at him. He also said he did not know that SUV was stolen until the men were on Frankfort, but he knew Harris was armed with a .357 magnum handgun.
 {¶ 41} Appellant rested and moved for Crim. R. 29 acquittal, which was denied. No witnesses were offered in rebuttal.
 {¶ 42} The jury found appellant guilty of the lesser included charge of felony murder, in violation of R.C. 2903.02(B) and of the charge of aggravated robbery, along with the firearm specifications for each. Appellant now appeals from that judgment, arguing the following six assignments of error:
 {¶ 43} "Assignment of Error Number One
 {¶ 44} "The trial court erred to the prejudice of Mr. Mason by overruling his objection to the state exercising its peremptory challenge to exclude a minority juror in *Page 17 
violation of his [sic] Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.
 {¶ 45} "Assignment of Error Number Two
 {¶ 46} "The trial court erred in denying Mr. Mason's motion to dismiss pursuant to Rule 29 presented at the conclusion of the State's case-in-chief for the reason that the evidence presented was insufficient to sustain convictions as to each count.
 {¶ 47} "Assignment of Error Number Three
 {¶ 48} "The trial court erred to the prejudice of Mr. Mason when it ordered him to pay unspecified costs, including court appointed fees, without first determining the ability to pay those costs.
 {¶ 49} "Assignment of Error Number Four
 {¶ 50} "A sentence imposing consecutive sentences for behavior that occurred before February 27, 2006 violates the due process and Ex Post Facto clauses of the United States Constitution, or, in the alternative, counsel was ineffective in failing to preserve this issue for review by this and other courts.
 {¶ 51} "Assignment of Error Number Five
 {¶ 52} "Cumulative errors deprive a criminal defendant and criminal appellant of a fair trial in violation of his rights under the Fifth,Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution."
 {¶ 53} "Assignment of Error Number Six *Page 18 
 {¶ 54} "The indictment in Mr. Mason's case alleging aggravated robbery suffers from structural error and is in violation of his right to notice and due process under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the Ohio Constitution."
 I. {¶ 55} We will first address appellant's sixth assignment of error, in which he argues that the indictment contained structural error, in violation of his constitutional rights. Appellant never challenged the sufficiency of the indictment at any time before or during his trial.
 {¶ 56} An appellate court need not consider an error that was not called to the attention of the trial court at a time when such error could have been avoided or corrected by the trial court. State v.Williams (1977), 51 Ohio St.2d 112, 117, vacated in part on other grounds, (1978), 438 U.S. 911. As a result, such error is waived absent plain error. State v. Moreland (1990), 50 Ohio St.3d 58, 62. Plain error does not exist unless, but for the error, the outcome at trial would have been different. Id.
 {¶ 57} The Supreme Court of Ohio recently examined the effect of a defective indictment under the plain error standard, holding that "[w]hen an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment." State v.Colon, 118 Ohio St.3d 26, 2008-Ohio-1624, at the syllabus ("ColonI"). In Colon, the appellant had been charged with robbery, in violation of R.C. 2911.02(A)(2). His indictment stated that *Page 19 
appellant "in attempting or committing a theft offense, as defined in Section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense upon [the victim, the defendant did] inflict, attempt to inflict, or threaten to inflict physical harm on [the victim]."
 {¶ 58} The Colon I court found that the indictment failed to contain a mens rea for the second element of the statutory offense, i.e., "inflict, attempt to inflict, or threaten to inflict physical harm on another." Consequently, the court reasoned that since the mens rea, "recklessness" was missing from the indictment which quoted the statutory language, appellant was not "properly informed of the charge so that he could put forth his defense." The court further stated that because the omission violated appellant's constitutional rights to notice and due process, it constituted plain error which permeated the entire criminal proceeding and was structural error. The Colon I court then reversed the conviction.
 {¶ 59} On reconsideration, the Ohio Supreme Court declared thatColon I was prospective, and "applies only to those cases pending on the date Colon I was announced. State v. Colon, 119 Ohio St.3d 204,2008-Ohio-3749, ¶ 5 ("Colon II "). The Court also stated that "the facts that led to our opinion in Colon I are unique," noting that there was no evidence in that case "to show that the defendant had notice that recklessness was an element of the crime of robbery, nor was there evidence that the state argued that the defendant's conduct was reckless." Id., ¶ 6. *Page 20 
 {¶ 60} Finally, the Colon II court stated that the trial court also did not include recklessness as an element of the crime in the jury instructions, and, during closing argument, the state treated robbery as a strict-liability offense. Id. The Colon II court then concluded that the structural-error analysis for defective indictments is "appropriate only in rare cases * * * in which multiple errors at trial follow the defective indictment." ¶ 8. The court then stated, "Seldom will a defective indictment have this effect, and therefore, in most defective indictment cases, the court may analyze the error pursuant to Crim. R. 52(B) plain error. Consistent with our discussion herein, we emphasize that the syllabus in Colon I is confined to the facts in that case."
 {¶ 61} In deciphering the ruling in Colon II, we conclude that the structural error analysis will apply to cases which, as indicated by the court, contain the following factors: a defective indictment; the defendant has had no notice of the specific mens rea of the offense where the default is to "reckless;" the jury instructions do not include recklessness as an element of the crime; and the crime charged is treated as a strict-liability offense when the mens rea is "reckless." Further, we have also said that as the Supreme Court urged in ColonII, the structural defect is rare and unique to the facts of that case. See State v. Walker, 6th Dist. No. L-07-1156, 2008-Ohio-4614. Therefore, we have not found a structural error when the offense is not robbery as in Colon I. Id.
 {¶ 62} R.C. 2911.02(A)(1) provides, that: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control." "Theft" *Page 21 
is defined in R.C. 2913.02(A), which provides in part that "[n]o person,with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent." (Emphasis added.) To be found guilty of aggravated robbery, in addition to the purpose to commit a theft offense, R.C. 2911.02(A)(1) requires only mere possession or control of a deadly weapon, as opposed to actual use or intent to use. State v.Wharf (1999), 86 Ohio St.3d 375, 378. Therefore, a violation of R.C. 2911.02(A)(1) is a strict liability offense which does not require a mens rea. Id.
 {¶ 63} In the present case, the two counts in appellant's indictment are interrelated, in that Count 1 depends upon a guilty finding for Count 2. Along with a firearm specification pursuant to R.C. 2941.145, Count 1 charged appellant with aggravated murder, in violation of R.C. 2903.01(B) and (F). That charge stated that appellant "didpurposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting [to] commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism or escape * * *."
 {¶ 64} Along with a firearm specification, Count 2 charged appellant with aggravated robbery, in violation of R.C. 2911.01(A)(1), in that appellant, "in attempting or committing a theft offense, or in fleeing immediately after the attempt or offense, did have a deadly weapon, to wit, a firearm, on or about the offender's person or under the *Page 22 
offender's control, and did either display the weapon, or brandish it, indicate that the offender possessed it, or use it * * *."
 {¶ 65} Count 2, aggravated robbery, is a strict liability offense and, other than the mens rea contained in the theft offense statute, does not require any further mens rea. Since Count 1 was predicated on a death being purposely caused during the commission of the aggravated robbery, no additional mens rea is needed. Therefore, we conclude that, in this case, the indictment was not defective, there is no plain error, andState v. Colon does not apply.
 {¶ 66} Accordingly, appellant's sixth assignment of error is not well-taken.
 II. {¶ 67} In his first assignment of error, appellant contends that the trial court erred in permitting the state to exercise a peremptory challenge to exclude a minority jury member.
 {¶ 68} Discriminatory use of peremptory challenges by the state violates the Fourteenth Amendment to the United States Constitution and is grounds for reversal of a conviction. See, generally, Batson v.Kentucky (1986), 476 U.S. 79. The determination of whether peremptory challenges have been exercised in a discriminatory manner involves a three-step inquiry. State v. Murphy (2001), 91 Ohio St.3d 516, 528. "In step one, the opponent of the peremptory challenge at issue must make a prima facie case that the proponent was engaging in racial discrimination. In step two, the proponent must come forward with a race-neutral explanation for the strike. In step three, the trial court must *Page 23 
decide, on the basis of all the circumstances, whether the opponent has proved racial discrimination." Id., citing Purkett v. Elem. (1995),514 U.S. 765, 767-768 and State v. White, 85 Ohio St.3d 433, 436.
 {¶ 69} "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."Hernandez v. New York (1991), 500 U.S. 352, 360. A trial court's factual finding that a peremptory strike was exercised without discriminatory intent will only be overturned on appeal if clearly erroneous. State v.Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106.
 {¶ 70} In this case, the defendants and victim were black. In exercising a peremptory challenge, the prosecution asked that a young black woman be excused. Appellant's counsel objected, asserting that the state displayed a pattern of dismissing black jurors. The prosecution then responded that he was concerned that, based upon the voir dire, the juror did not understand the concept of complicity and how a person could be found guilty under that concept. He questioned her ability to sit on the jury based upon her responses during a discussion about "an aider and abettor in the complicity actions of a crime." The court found that the prosecutor's challenge was race-neutral, since there had been a specific interchange with the juror about an issue which directly affected her ability to understand and apply the law. Our review of the record indicates sufficient support for the reason given for the prosecutor's challenge. Therefore, we conclude that the trial court's finding was not clearly erroneous.
 {¶ 71} Accordingly, appellant's first assignment of error is not well-taken. *Page 24 
 III. {¶ 72} In his second assignment of error, appellant argues that the trial court erred in denying his Crim. R. 29 motion for acquittal at the end of the state's case-in-chief.
 {¶ 73} A Crim. R. 29 motion is a test of the sufficiency of the state's evidence. Evidential sufficiency involves an analysis of whether the case should have gone to the jury. See, State v. Thompkins,78 Ohio St.3d 380, 386. When examining a claim that there was insufficient evidence to sustain a conviction, the "inquiry is, after viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, 273.
 {¶ 74} Thus, in determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, supra, at paragraph two of the syllabus; State v. Yarbrough, 95 Ohio St.3d 227,2002-Ohio-2126, ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim). A guilty verdict will not be disturbed on appeal unless reasonable minds could not reach the conclusion reached by the trier-of-fact.Jenks, supra, at 273; State v. Dennis (1997), 79 Ohio St.3d 421, 430.
 {¶ 75} R.C. 2903.02(B), felony murder, states that: *Page 25 
 {¶ 76} "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 77} Thus, the felony murder component of the murder statute, R.C. 2903.02(B), does not require any purpose or specific intent to cause death.
 {¶ 78} R.C. 2911.01(A), aggravated robbery, provides that:
 {¶ 79} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 80} "* * * (2) Have a dangerous ordnance on or about the offender's person or under the offender's control; * * *."
 {¶ 81} At trial, evidence was presented that, on the night of the shooting, appellant had been a part of a prior discussion about "hitting a lick" in reference to robbing Coley, rode around in and arrived at the victim's residence in a stolen vehicle, was carrying a loaded firearm, and went up to the door with Harris, the shooter. Although appellant denied any intent to rob or kill the victim or that he had any knowledge that Harris would shoot and kill Coley, the fact remains that appellant did not disengage himself from the company of men who had stolen a vehicle and clearly expressed their desire and intent to commit a second crime, robbery. *Page 26 
 {¶ 82} Moreover, appellant knew all three men were carrying firearms, making the risk of harm to another person reasonably foreseeable. Despite appellant's denial, circumstantial evidence was presented from which the jury could have properly inferred that, although not the actual shooter, appellant went along with the plan and did nothing to stop it. Therefore, we conclude that, when construed most favorably to the state, sufficient evidence was presented from which the jury could find beyond a reasonable doubt that all the essential elements of the underlying crimes of aggravated robbery and the felony murder had been established.
 {¶ 83} Accordingly, appellant's second assignment of error is not well-taken.
 IV. {¶ 84} In his third assignment of error, appellant claims that the trial court erred in ordering him to pay unspecified costs, including court appointed fees, without first determining the ability to pay those costs. In this case, the trial court did not assess any fines, but did order appellant to reimburse the state and Lucas County for "the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law." The court also ordered appellant to pay "the cost assessed pursuant to R.C. 9.92(C), 2929.18 and2951.021."[1]
 {¶ 85} We initially note that, at the time of sentencing, appellant did not move the court to waive payment of costs. A failure to bring an error to the attention of the trial *Page 27 
court at a time when the court could correct that error constitutes a waiver of all but plain error. State v. Johnson, 164 Ohio App.3d 792,2005-Ohio-6826, ¶ 22. See, also, State v. Phillips, 6th Dist. No. F-05-032, 2006-Ohio-4135, ¶ 14, citing State v. Threatt,108 Ohio St.3d 277, 2006-Ohio-905, ¶ 23. Plain error is an obvious error or defect in the trial proceedings that affects a substantial right. Crim. R. 52(B);State v. Lindsey, 87 Ohio St.3d 479, 482. It is plain error for a trial court to order a defendant to pay certain financial sanctions without determining his present and future ability to pay. See State v.Kuhn, 6th Dist. No. L-02-1141, 2003-Ohio-3099; State v. Moore, 12th Dist. No. CA20006-09-242, 2007-Ohio-3472.
 {¶ 86} We note, however, that, in all criminal cases, a judge must include "in the sentence the costs of prosecution and render a judgment against the defendant for such costs" and "the fees of the jurors shall be included in the costs." R.C. 2947.23; Phillips, supra, ¶ 15, citingThreatt, supra. In assessing the costs of prosecution, the trial court need not consider appellant's financial condition or future employability. Phillips, supra. Although a trial court may, in its discretion, waive those costs for the indigent defendant, it is not required to do so. State v. White (2004), 103 Ohio St.3d 580,2004-Ohio-5989, ¶ 14.
 {¶ 87} In this case, even if appellant had requested the waiver, the trial court could have assessed prosecution costs to appellant without determining his ability to pay. Therefore, we conclude that the trial court did not err in assessing those costs. *Page 28 
 {¶ 88} We will now determine whether payment of the remaining costs, including fees for assigned counsel, was properly imposed. "Only pursuant to R.C. 2941.51 can a trial court order a criminal defendant to pay his appointed counsel's fees." State v. Holmes, 6th Dist. No. L-01-1459, 2002-Ohio-6185, ¶ 20. R.C. 2941.51 states in relevant part:
 {¶ 89} "(D) The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay."
 {¶ 90} The finding that a criminal defendant has the ability to pay court-appointed counsel's costs must be supported by clear and convincing evidence. R.C. 2953.08(G)(2)(b); State v. John, 6th Dist. No. L-03-1261, 2005-Ohio-1218, ¶ 29, reversed on other grounds by In reOhio Criminal Sentencing Statutes Cases (2006), 109 Ohio St.3d 313,2006-Ohio-2109, following State v. Foster (2006), 109 Ohio St.3d 1,2006-Ohio-856. Although a court is neither required to hold a hearing to make this determination nor to indicate in its judgment entry that it considered a criminal defendant's ability to pay, there must be some evidence in the record to show that the court did consider this question. Phillips, supra, ¶ 18. An appellate court examines the totality of the record when deciding whether this requirement was satisfied. Id. A presentence investigation report may be sufficient to demonstrate that the trial court *Page 29 
considered an offender's ability to pay a financial sanction. State v.Felder, 2d Dist. No. 21076, 2006-Ohio-2330, ¶ 64.
 {¶ 91} Likewise, R.C. 2929.18 authorizes a trial court to impose certain financial sanctions, including the cost of confinement, upon an offender. Again, before imposing a financial sanction under R.C. 2929.18, a trial court must consider the offender's present and future ability to pay the amount of the sanction or fine. R.C. 2929.19(B)(6). See State v. Garcia, 12th Dist. No. CA2005-09-410, 2006-Ohio-4208,¶ 6; State v. Kuhn, 6th Dist. No. L-02-1141, 2003-Ohio-3099; State v.Holmes, supra, ¶ 21. There are no express factors that must be considered or specific findings that must be made. State v. Martin,140 Ohio App.3d 326, 338. All that is required under R.C. 2929.19(B)(6) is that the trial court "consider the offender's present and future ability to pay." Id. Compliance with R.C. 2929.19(B)(6) may also be shown when a trial court considers a PSI that details pertinent financial information, or when a transcript shows that the court at least considered the defendant's ability to pay. Slater, Scioto App. No. 01 CA2806, ¶ 8.
 {¶ 92} In this case, we find that there is nothing in the record indicating that the trial court considered appellant's present and future ability to pay. Although the court considered a presentence investigation ("PSI") report, that document states only that appellant was age 22, was "unemployed," and had completed the ninth grade. The PSI report does include an unsupported, conclusory statement, "Defendant found to have, or reasonably may be expected to have, the means to pay all or some part of the costs assessed in this case." Without any supporting information, we conclude that this *Page 30 
determination was insufficient to comply with the statutory requirements. Rather, this finding must be made by the trial court, not the PSI interviewer, after fully considering appellant's financial situation.
 {¶ 93} In addition, we find no other evidence in the record from which the trial court could determine appellant's financial status or employment history. Consequently, the trial court failed to comply with the legislative mandate under R.C. 2929.19(B)(6) or 2941.51(D) to consider appellant's present and future ability to pay before it assessed the costs. Therefore, we conclude that appellant was prejudiced and it was plain error for the trial court to order appellant to pay costs of supervision, confinement, assigned counsel, or other fees, without considering his ability to pay.
 {¶ 94} Accordingly, appellant's third assignment is not well-taken with regard to the costs of prosecution, but is well-taken with regard to the other costs assessed. On remand, prior to assessing such costs, the trial court is instructed to consider and determine appellant's present and future ability to pay any costs authorized by R.C. 2929.18(A)(4) or 2941.51 or 2941.53, consistent with the law and this opinion.
 V. {¶ 95} In his fourth assignment of error, appellant contends that the court erred in imposing consecutive sentences for offenses, or in the alternative, he was denied effective assistance of counsel.
 {¶ 96} In State v. Foster, the Supreme Court of Ohio, in striking down parts of Ohio's sentencing scheme, held that "[t]rial courts have full discretion to impose a prison *Page 31 
sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." 109 Ohio St.3d 1, 2006-Ohio-856, paragraph seven of the syllabus. Thus, an appellate court reviews felony sentences for an abuse of discretion. Id. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983) 5 Ohio St.3d 217, 219. When applying an abuse of discretion standard, an appellate court may not generally substitute its judgment for that of the trial court. See Ports v. Ohio State Med.Bd. (1993), 66 Ohio St.3d 619.
 {¶ 97} Nonetheless, R.C. 2929.11 and 2929.12, which require consideration of the purposes and principles of felony sentencing and the seriousness and recidivism factors, must still be considered by trial courts in sentencing offenders. State v. Mathis,109 Ohio St.3d 54, 2006-Ohio-855, ¶ 38. R.C. 2929.11(A) provides that when a trial court sentences an offender for a felony conviction it must be guided by the "overriding purposes of felony sentencing." Those purposes are "to protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.11(B) states that a felony sentence "must be reasonably calculated to achieve the purposes set forth under R.C. 2929.11(A), commensurate with and not demeaning to the seriousness of the crime and its impact on the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." Finally, R.C. 2929 .12 sets forth factors concerning the seriousness of the offense and recidivism factors. *Page 32 
 {¶ 98} In this case, the sentencing ranges for appellant's offenses are as follows: felony murder — an indefinite term of 15 years to life [2929.02(B)(1)]; aggravated robbery, a first degree felony — three, four, five, six, seven, eight, nine, or ten years [R.C. 2929.14(A)(1)]; firearm specifications — mandatory three years. Since the trial court's sentences were within the range for each of these offenses and the court was not required to provide any supporting factors for imposing consecutive sentences, appellant's argument is without merit. Therefore, we cannot say that the trial court abused its discretion.
 {¶ 99} Accordingly, appellant's fourth assignment of error is not well-taken.
 VI. {¶ 100} In his fifth assignment of error, appellant argues that cumulative
errors occurred which denied him a fair trial, as a result of the violation of his rights under the Fifth, Sixth, andFourteenth Amendments to the United States Constitution and provisions of the Ohio Constitution.
 {¶ 101} "The cumulative error doctrine holds that a judgment may be
reversed if the cumulative effect of multiple harmless errors deprives a defendant of his constitutional rights, even though the errors individually may not rise to the level of prejudicial error." State v.Garner (1995), 74 Ohio St.3d 49, 64; State v. DeMarco (1987),31 Ohio St.3d 191, paragraph two of the syllabus. If, however, a reviewing court finds no prior instances of error, then the doctrine has no application. See State v. Bennett, 4th Dist. App. No. 05CA2997, 2006-Ohio-2757,¶ 50. Since we determined that only one of *Page 33 
appellant's other assignments of error had partial validity, his cumulative error argument is without merit.
 {¶ 102} Accordingly, appellant's fifth assignment of error is not well-taken. All pending motions are deemed moot.
 {¶ 103} The judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part. This case is remanded to the trial court for proceedings consistent with this decision. Appellant and appellee are each ordered to pay one-half the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Arlene Singer, J., CONCUR.
[1] R.C. 2951.021 applies to supervision of offenders under community control or probation. Therefore, since appellant was not sentenced to community control or probation, that section is inapplicable to his costs. *Page 1