DECISION AND JUDGMENT
{¶ 1} Defendant-appellant, James E. Harris, Jr., appeals the December 7, 2006 judgments of the Lucas County Court of Common Pleas which, following a jury trial convicting appellant of aggravated murder and aggravated robbery, with gun specifications, burglary, and two counts of receiving stolen property, sentenced appellant *Page 2 
to a minimum prison sentence of 33 years. For the reasons that follow, we affirm, in part, and reverse, in part.
 {¶ 2} On February 8, 2006, appellant was indicted on one count of burglary, in violation of R.C. 2911.12(A)(2) and (C), and three counts of receiving stolen property, in violation of R.C. 2913.51.[1] On February 13, 2006, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01(B) and (F), and aggravated robbery, in violation of R.C. 2911.01(A)(1). Both counts included firearms specifications under R.C. 2941.145[2] The charges stemmed from events occurring on February 1 and 2, 2006, which included the homicide of Rodney Coley. Appellant entered not guilty pleas to the charges.
 {¶ 3} On November 2, 2006, appellant filed a motion in opposition to joinder of the charges for trial. Appellant argued that separate trials were necessary because his defenses to the charges may vary and that the evidence as to the discrete offenses would not admissible if the counts were to be tried separately. Appellant further asserted that he may desire to testify as to some of the charges, but not all of the charges. On the morning *Page 3 
of trial, the parties made further arguments relating to appellant's opposition to joinder; the trial court then, concluding that the offenses were a continuous course of conduct, denied the motion.
 {¶ 4} During trial, the following evidence was presented. The state first presented testimony from multiple witnesses regarding the February 2, 2006 burglary and receiving stolen property offenses. Fulton County Sheriff's Deputy Aaron Gladieux testified that on February 2, 2006, at approximately 10:00 a.m., he was patrolling eastern Fulton County, on Frankfort Road, when he observed a green SUV approaching with no front license plate. Deputy Gladieux stated that the black males in the vehicle were acting "suspicious" and, due to recent burglaries in the area, he decided to pull the vehicle over. Deputy Gladieux stated that as he was turning his vehicle around, the SUV pulled into a residential driveway; Gladieux testified that appellant was driving the vehicle.
 {¶ 5} Deputy Gladieux testified that as he drove by the parked vehicle there were no occupants. Gladieux waited down the road to see what would happen. The vehicle exited the driveway and proceeded eastbound. Before Gladieux could stop the vehicle it pulled into another driveway and the three occupants exited. Deputy Gladieux testified that he radioed the Lucas County Sheriff's Office for assistance and then confronted the three suspects. One of the suspects approached while the other two ran. They were all apprehended.
 {¶ 6} Deputy Gladieux testified that he confirmed that the vehicle had been stolen the day before from Wood County. Gladieux testified that after securing the scene *Page 4 
he turned the investigation over to Lucas County as the suspects were located in their jurisdiction.
 {¶ 7} Lucas County Sheriff's Detective Mark Woodruff testified that he responded to a call at 12255 Frankfort Road. Detective Woodruff testified that he recovered a firearm, a .357, from a basement window well; it had been covered with rocks and bricks. A box of ammunition was also recovered from the window well. A second weapon, a Taurus Model .38, was later found by the homeowner in a bag of dog food in the garage. Finally, a .22 revolver was found in the vehicle. The weapons were turned over to the Toledo Police Department.
 {¶ 8} Next, three individuals testified regarding crimes that took place at their residences. Dan Paulus testified that he resides in Bowling Green, Wood County, Ohio, and that on February 1, 2006, his home was broken into and his green Ford Expedition was stolen from his garage. The vehicle was recovered on February 2, 2006. Shane Garlick testified that he resides in Berkey, Lucas County, Ohio, and that on January 30, 2006, his home was broken into and a .357 Smith Wesson was stolen. Garlick testified that the .357 in evidence looked exactly like his and that he was told that the serial numbers matched. Garlick further testified that ammunition was stolen from his home. John Kreuz testified that he resides on Frankfort Road in Swanton, Lucas County, Ohio. Kreuz testified that on February 2, 2006, he was notified that three individuals were apprehended at his home. Kreuz stated that at the time, nine of his 13 children were in the home. Kreuz testified that the dog food bag where the .22 was found was inside the *Page 5 
attached garage. Kreuz stated that he did not give anyone other than his family permission to be on the premises.
 {¶ 9} The state then presented testimony about the events of the prior evening. Rodney Coley, Jr., 16, testified that the victim, Rodney Coley, was his father and that he lived with him. Two of his four brothers also lived in the home located on Bryn Mawr Drive in Toledo, Lucas County, Ohio.
 {¶ 10} Rodney[3] testified that on February 1, 2006, he returned home from school at approximately 3:45 p.m. About one hour later, Coley arrived home. Approximately 35 minutes later, Coley left again and returned around 6:30 p.m. Rodney testified that Coley left again around 7:00 p.m.; Rodney did not know where his father went. Coley returned at approximately 7:30 p.m. with a friend named Antonio who was Rodney's age. About 30 minutes later, Coley informed Antonio that it was time to make a run and the two left. Rodney testified that he did not know what "make a run" meant. Coley returned and, after working on his car stereo, he again left the house.
 {¶ 11} Rodney testified that at approximately 9:30 p.m., Coley telephoned and told his sons to turn off all the lights, lock the doors, and go to bed. Rodney testified that his bedroom is in the front of the house and that he heard his father and some people come home and go downstairs. After approximately 15 minutes they left and he heard Coley come upstairs and unlock and go into his bedroom which was across from Rodney's. *Page 6 
Rodney testified that Coley owned a gun (he had a permit for it) and that he wore it on his hip. He had not seen him wearing it that day. Coley then went down to the basement.
 {¶ 12} Rodney testified that he heard three or four different voices whispering on the front steps. Rodney stated that he then heard someone "fidgeting" with the door knob; he then heard a quiet knocking that got progressively louder. Rodney stated that he then heard Coley running up the basement steps. According to Rodney, one of the men asked if someone lived there; Coley responded that he did not know anyone by that name. Rodney testified that he then heard "shuffling" like someone was trying to get in. He then heard the door close loudly and lock. Immediately after that, Rodney testified that he heard gunshots.
 {¶ 13} Rodney testified that he went to his brothers and that they called the police. They did not go downstairs until they saw the police in the backyard. They saw Coley lying on his side on the living room floor. Rodney stated that Coley was bleeding and that he was dead. Rodney also testified that Coley's gun was in the holster at his hip which was snapped shut.
 {¶ 14} During cross-examination, Rodney testified that he never witnessed Coley selling marijuana. Rodney stated that he never heard any of the voices on the front porch ask Coley for his money or his marijuana and that he was not aware of any items missing from the house.
 {¶ 15} The state then presented testimony from Toledo Police officers who responded to the scene. Officer Irma Oberneder testified that she was near the Bryn *Page 7 
Mawr address when she received a call of gunshots being fired. Officer Oberneder testified that when she walked in the front door she observed a man lying face down on the floor. Oberneder testified that he appeared to be deceased and that she radioed for a life squad. When the EMS personnel arrived and began to work on him they rolled him over and Officer Oberneder testified that she observed a weapon in a holster on his waistband. Oberneder did not remember whether the holster was snapped shut. Oberneder removed the weapon (still in the holster) and placed it by the fireplace.
 {¶ 16} Officer Brian Bortel testified that at approximately 10:45 p.m. he was dispatched to the Bryn Mawr address on a call that gunshots were heard. Officer Bortel testified that he was not the first officer at the scene. Bortel testified that Officer Oberneder secured Coley's gun and identified a photograph depicting the gun by the fireplace. Bortel testified that the holster appeared to be snapped shut.
 {¶ 17} Toledo Police Sergeant Paul Armola testified that when he arrived at the scene, EMS personnel were providing medical treatment to Coley. Sergeant Armola observed Coley's weapon because it was unique and expensive. Armola testified that it was in a leather holster that was snapped shut. Armola admitted that he was not aware whether the holster was snapped when the weapon was found on Coley.
 {¶ 18} Toledo Police Detective Chad Culpert, assigned to the Scientific Investigation Unit, processed the Bryn Mawr crime scene. Culpert photographed the exterior of the house and the interior, including Coley, and diagrammed the interior of the *Page 8 
house. Detective Culpert testified that he and Detective Gerald Schriefer collected projectiles which were then secured in the property room until needed.
 {¶ 19} Detective Culpert then testified regarding photographs depicting the original locations of the projectiles. One of the projectiles passed through the lower portion of the front door and was embedded in the floor just inside the door. Another projectile went though the fireplace screen and was embedded in the back wall of the fireplace. A third projectile was recovered next to Coley.
 {¶ 20} Detective Gerald Schriefer, also of the Scientific Investigation Unit, testified regarding fingerprint evidence that was taken from the Coley residence. Detective Schriefer was able to obtain a couple of partial fingerprints from the storm door. Schriefer testified that an identification from a partial print is possible is there are enough identifiers (ridges, dots, bifurcations, etc.). Schriefer then put the print onto AFIS (the national fingerprint identification database.) The database provides the top 12 or so matches. Detective Schriefer testified that appellant's fingerprint came back as the closest match. This finding was verified by another officer.
 {¶ 21} David Cogan, Toledo Police Crime Laboratory Director, testified next. Cogan testified that his primary duties are firearms examinations. Cogan explained that he conducts firearms comparison tests which compare the projectile found at the crime scene with the suspected firearm. Cogan stated that he looks at both the macroscopic and microscopic characteristics. Cogan testified that each firearm is microscopically distinct. *Page 9 
 {¶ 22} Cogan stated that he conducted a test fire of the .357 Smith Wesson that was found in the window well on Frankfort Road. Cogan then compared the projectiles to those found on Bryn Mawr. Cogan testified that after visually determining that the barrel and projectiles were similar he conducted a microscopic examination. Cogan found that the striations or scratches on the projectiles were similar. Cogan stated that he also compared the .38 Taurus and the Bryn Mawr projectiles and that the rifling characteristics were different. Cogan then testified that based on his education, training, and experience, the .357 Smith Wesson fired the two complete projectiles recovered from the crime scene.
 {¶ 23} Forensic scientist Lindsay Hail, from the Ohio Bureau of Criminal Investigations, testified that on February 8, 2006, she received a .357 Smith Wesson and a .38 Taurus. Hail also received buccal swabs (or swabs taken from the inside of a person's cheek) from appellant, Christopher Mason, and Dante Boone. Hail testified that she swabbed the weapons, specifically the handles and triggers, for DNA evidence. Hail indicated that she was able to get DNA profiles from both of the weapons.
 {¶ 24} The DNA report issued in the case and admitted into evidence found that appellant could not be excluded as the major contributor of DNA on the .357 Smith Wesson. Hail testified that frequency of the DNA profile found on the weapon was "1 in 5 quintillion, 659 quadrillion individuals." Hail further found that Christopher Mason was the major contributor of DNA on the .38 Taurus. Hail admitted that she never received the .22 weapon recovered in the Expedition. *Page 10 
 {¶ 25} Lucas County Deputy Coroner, Cynthia Bessier, testified that Coley's gunshot wound was located on the upper right side of his chest. The projectile proceeded through Coley's upper lobe of his right lung, the upper portion of his heart, and his esophagus and exited through the lower lobe of his left lung. Bessier testified that the cause of Coley's death was a gunshot wound to the chest and that the manner of death was homicide.
 {¶ 26} The state's final witness was co-defendant Dante Boone. Boone testified that on February 1, 2006, between 7:30 and 8:00 p.m., he arrived at a party at a government housing complex on Elizabeth Street in Toledo, Lucas County, Ohio. Boone began drinking gin. Boone stated that appellant and Christopher Mason arrived at the party between 9:30 p.m. and 10:00 p.m. Boone testified that he observed appellant and Mason arrive in a green Expedition, with appellant driving, and that he had not seen the vehicle before.
 {¶ 27} Boone testified that he, appellant, and Mason began discussing what "was going to go down" that night. Boone clarified that they intended to burglarize a house. According to Boone, appellant asked him if he "had any licks;" meaning, did Boone know of a place to burglarize. Boone testified that he gave appellant Coley's name because Coley sold marijuana and Boone thought that he would have a lot of money. Boone stated that he had been to Coley's house on three to four prior occasions and had smoked marijuana there. Boone testified that on one occasion he saw a garbage bag full of marijuana in the detached garage. *Page 11 
 {¶ 28} The three then left in the Expedition to break into Coley's home; Boone testified that they were all armed with handguns. When they arrived, they parked a few houses down. Boone testified that he did not go up to the door because Coley would have recognized him and he had never gone there alone.
 {¶ 29} Boone testified that appellant and Mason walked up to the door; Mason knocked on the door. Boone stated that he was approximately 15 feet away and could see what was transpiring. According to Boone, he saw the door open a crack and Mason asked for Ashley. Boone saw Coley in the doorway. Boone testified that Mason started to walk away but appellant, who was initially sitting on the front porch, turned, grabbed the storm door, and shot through the door. Appellant fired his weapon three times. Boone testified that they all ran back to the Expedition and drove back to the housing complex. The three then split up and Boone did not see them for the rest of the night.
 {¶ 30} The next morning, the three met up again and, with appellant driving, were proceeding along Hill Avenue when Boone received a "chirp" or walkie-talkie communication, on his cellular phone. A friend informed Boone that Coley was dead.
 {¶ 31} Boone testified that they continued driving around and ended up in Western Lucas County, Ohio, on Frankfort Road. Boone stated that they observed a sheriff's deputy so they pulled into a driveway, jumped out of the Expedition, and attempted to hide the weapons. Boone stated that a deputy told him to freeze so he stopped and he got face-down on the ground. Boone testified that he saw both Mason and appellant go into the garage. *Page 12 
 {¶ 32} Boone testified that at the police station he was interviewed about the burglary. Later Boone was interviewed about the murder; Boone admitted that he was initially untruthful because he did not want to be charged with such a serious crime. Boone stated that his testimony was the truth.
 {¶ 33} During cross-examination, Boone was asked why, if he knew that Coley kept marijuana in the garage, they went to the front door to break in. Boone responded that Coley kept marijuana in the house too. Boone testified that when he was at the house on prior occasions, he never saw Coley with a gun.
 {¶ 34} Boone testified that when appellant and Mason were at the door, Coley was holding something that appeared to be a gun. Boone testified that he believed that appellant shot Coley because he either had a gun or was reaching for his gun.
 {¶ 35} Regarding the Frankfort Road incident, Boone testified that he left his weapon in the car. Boone further stated that when he ran around to the back of the house he could see the side with the garage door. Boone again testified that he saw appellant go into the garage.
 {¶ 36} At the close of the state's case, appellant moved for a Civ. R. 29 acquittal which was denied. Appellant then testified in his own defense.
 {¶ 37} Appellant testified that on February 1, 2006, he was at a party with Mason and Boone and that they wanted to smoke marijuana but that there was none at the party. Boone suggested that they go to Coley's house. Appellant denied any discussion about robbing Coley. *Page 13 
 {¶ 38} Appellant testified that he and Mason went up to Coley's front door. According to appellant, Coley looked through the blinds before opening the door and Mason stated that Coley looked like the person who had jumped him at a nightclub. Coley then opened the door and he and Mason began "scuffling." Appellant testified that he pulled them apart. Coley then "jumped back" and pulled his gun; appellant stated that he then drew his weapon because he feared that Coley would shoot him. Appellant testified that he began to run and shoot simultaneously.
 {¶ 39} After the trio returned to the housing complex, appellant went home. Appellant stated that he left the apartment to get marijuana from a neighbor, returned home and smoked it, and then went to bed.
 {¶ 40} The next day, appellant, Mason, and Boone reunited and were out driving. Appellant testified that they spotted a sheriff's deputy so they pulled into a driveway on Frankfort Road and ran. Appellant stated that he ran behind the house and tried to hide his gun under some bricks. Appellant denied ever entering the garage.
 {¶ 41} Appellant was asked whether, other than law enforcement and his attorney, he had spoken about the case to anyone else. Appellant testified that he had spoken with two inmates: Greg Smith and Andrew Strouss. Appellant testified that he and Strouss were smoking marijuana in the county jail and that appellant shared information about the charges against him. Appellant further testified that Greg Smith was Dante Boone's brother and that he felt comfortable speaking with him. *Page 14 
 {¶ 42} Appellant was then cross-examined by the state. Appellant testified that Mason initially arrived with the Expedition and that it was a "fiend rental"; appellant did not know the name of the drug fiend or drug addict. (Appellant indicated the he also purchased his gun from a fiend for $50.) Appellant stated that Mason drove the three to the Frankfort Road location.
 {¶ 43} Regarding the Bryn Mawr events, appellant testified that Mason asked Coley if they could purchase marijuana and then the two began "tussling." Appellant testified that he pulled Mason back and pushed Coley away. Appellant stated that Coley then pointed the gun at him; appellant pulled his gun out, began shooting, and then ran. The state questioned the fact that all three of the projectiles from appellant's gun went through the door. Appellant indicated that Coley was able to get the door shut before appellant starting shooting. Appellant further testified that Coley shut the door hard and that it sounded like a gun shot.
 {¶ 44} Appellant then recalled Detective Gerald Schriefer who testified that a baggie containing what appeared to be marijuana was pulled from Coley's right front pants pocket. Appellant then rested and renewed his Crim. R. 29 motion for acquittal. It was again denied.
 {¶ 45} On rebuttal, the state presented the testimony of Andrew Strouss. Strouss testified that he was serving a ten-month prison term for burglary and vandalism and that he had not been offered any type of deal or compensation for his testimony. Strouss stated that in June 2006, he was in the Lucas County Jail with appellant; appellant told *Page 15 
him that he was in jail for the murder of an individual they had intended to rob for his marijuana.
 {¶ 46} Strouss testified that appellant told him that one of the three knocked on Coley's door while appellant crouched down next to the door. According to Strouss, Coley opened the door and then slammed it in their faces. Appellant then shot through the door.
 {¶ 47} During cross-examination, Strouss admitted that during a videotaped interview he stated that he would do anything to get his charges reduced. Strouss indicated that he now has served most of his time. Appellant's counsel reminded him that he has only served approximately one-half of a 32 month sentence.
 {¶ 48} Strouss admitted that when he first began talking with detectives about appellant's case, he mistakenly gave them information about a different homicide. Strouss also admitted that he initially told police that the murder occurred out in the country. Strouss testified that he and appellant maintained contact through letters but that they probably did not exist anymore.
 {¶ 49} Following the conclusion of the evidence, the jury found appellant guilty of all the counts charged. On December 7, 2006, appellant was sentenced to life in prison, with the possibility of parole after 25 years, for the aggravated murder charge, with three additional years of imprisonment for the firearms specification. Appellant received an eight-year prison term for aggravated robbery, also with an additional three years for the firearms specification. The aggravated murder and robbery convictions were ordered to *Page 16 
be served concurrently. The firearms specifications were ordered to be served concurrently with each other. Appellant was also ordered to serve five years in prison for burglary, and 16 months for each receiving stolen property conviction. The burglary and receiving stolen property convictions were ordered to be served concurrently, but consecutive to the murder and robbery convictions. Thus, appellant was sentenced to a minimum of 33 years in prison. This appeal followed.
 {¶ 50} Appellant now raises the following five assignments of error:
 {¶ 51} "Assignment of Error No. I: The trial court abused its discretion by refusing to grant separate trials for the two indictments pursuant to Crim. R. 14. Harris' right to a fair trial was further denied because this issue was not decided in a timely manner.
 {¶ 52} "Assignment of Error No. II: Harris' convictions for aggravated murder, aggravated robbery and burglary were against the manifest weight of the evidence.
 {¶ 53} "Assignment of Error No. III: Harris' Rule 29 motion should have been granted because the state failed to prove beyond a reasonable doubt all the elements of aggravated murder, burglary and aggravated robbery.
 {¶ 54} "Assignment of Error No. IV: Harris' sentence violated his constitutional rights because the trial court did not impose a sentence that was the shortest available.
 {¶ 55} "Assignment of Error No V: The indictment in this case did not expressly charge the mens rea element of the crime of aggravated robbery. As such, the defective indictment is a structural error and Harris' convictions for aggravated murder and robbery, with the accompanying firearms specifications, must be reversed." *Page 17 
 {¶ 56} We will first address appellant's fifth assignment of error. Appellant argues that because the indictment in the case did not charge the means rea element for the charge of aggravated robbery, the defect in the indictment is structural and appellant's convictions for aggravated murder and robbery must be reversed.
 {¶ 57} We first note that appellant failed to raise this issue during the trial court proceedings. In support of his argument, appellant relies on the Supreme Court of Ohio case captioned State v. Colon,118 Ohio St.3d 26, 2008-Ohio-1624. Conversely, the state argues that there is no mens rea required for aggravated robbery with a firearm specification.
 {¶ 58} In State v. Colon ("Colon I"), the court held that where an indictment for robbery failed to contain the applicable reckless element, the issue was not waived where the defendant failed to raise the defect in the trial court. Id. at syllabus. The Colon I court then determined that the defect was a "structural error" because the defective indictment "permeated" the entire trial. Id. at ¶ 29-31.
 {¶ 59} On reconsideration, the Supreme Court of Ohio clarified its rulings. State v. Colon, 119 Ohio St.3d 204, 2008-Ohio-3749 ("ColonII"). The court first noted that the Colon I decision was prospective in nature. Id. at ¶ 3. The court then stressed that the facts in theColon I decision were "unique" in that "the defective indictment resulted in several other violations of the defendant's rights." Id. at ¶ 6. The court then concluded that the structural-error analysis is appropriate only in "rare" cases and that "in most defective indictment cases, the court may analyze the error pursuant to Crim. R. 52(B) *Page 18 
plain-error analysis." Id. at ¶ 8. The court then emphasized that the "syllabus in Colon I is confined to the facts in that case." Id.
 {¶ 60} In his assignment of error, appellant argues that, just as inColon I, the indictment is defective because it failed to include a reckless mens rea element for the aggravated robbery charge. Appellant was charged with aggravated murder under R.C. 2903.01(B), which requires the proof of a predicate offense. Appellant was charged with the predicate offense of aggravated robbery under R.C. 2911.01(A)(1), which provides:
 {¶ 61} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 62} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * * ."
 {¶ 63} The Supreme Court of Ohio, in State v. Wharf,86 Ohio St.3d 375, 1999-Ohio-112, held that "[t]o establish a violation of R.C. 2911.02(A)(1), it is not necessary to prove a specific mental state regarding the deadly weapon element of the offense of robbery." Id. at paragraph two of the syllabus. R.C. 2911.02(A)(1) provides:
 {¶ 64} "(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 65} "(1) Have a deadly weapon on or about the offender's person or under the offender's control; * * *." *Page 19 
 {¶ 66} The Wharf court concluded that "the General Assembly intended that a theft offense, committed while an offender was in possession or control of a deadly weapon, is robbery and no intent beyond that required for the theft offense must be proven." Id. at 377.
 {¶ 67} In State v. Ferguson, 10th Dist. No. 07AP-640, 2008-Ohio-3827, the court applied Wharf in a post-Colon case. In Ferguson, the appellant argued that, under Colon, the indictment charging him with aggravated robbery and robbery was defective because it omitted the recklessness mens rea. Id. at ¶ 31. The court first noted that the charge at issue was, unlike Colon, R.C. 2911.01(A)(1). The court then noted "that although Wharf involved an examination of R.C. 2911.02(A)(1), its holding has been held applicable to R.C. 2911.01(A)(1)." Id. at ¶ 46, citing State v. Kimble, 7th Dist. No. 06 MA 190, 2008-Ohio-1539. TheFerguson court concluded that the statute was unaffected by theColon holding. Id. at ¶ 50.
 {¶ 68} This court has also held that R.C. 2911.01(A)(1) is a strict liability offense for which no mens rea need be proven. In State v.Mason, 6th Dist. No. L-06-1404, 2008-Ohio-5034, appellant's co-defendant's indictment for a violation of R.C. 2911.01(A)(1), charged under the same indictment as appellant, was found not to be implicated by Colon. Accordingly, appellant's fifth assignment of error is not well-taken.
 {¶ 69} In appellant's first assignment of error, he contends that the trial court abused its discretion by failing to grant separate trials pursuant to Crim. R. 14. Alternatively, appellant argues that he was prejudiced by the court's denial of the motion *Page 20 
on the morning of trial. Specifically, appellant contends that the separate indictments for aggravated murder and aggravated robbery, and burglary and receiving stolen property should have been tried separately.
 {¶ 70} Pursuant to Crim. R. 13, separate indictments may be tried together "if the offenses or the defendants could have been joined in a single indictment or information." Crim. R. 8 provides that a trial court may join offenses in the same indictment "if the offenses charged, whether felonies or misdemeanors or both, * * * are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
 {¶ 71} Crim. R. 14 provides:
 {¶ 72} "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."
 {¶ 73} Upon review, we agree that joinder of the indictments was permissible under Crim. R. 8(A). The two incidents were closely related in time and involved the same individuals. There was evidence presented that the same stolen vehicle was used during both incidents and the weapon that was used during the shooting was the same weapon that appellant attempted to hide on Frankfort Road. *Page 21 
 {¶ 74} We now turn to the question of whether appellant was prejudiced by the joinder. In State v. Torres (1981), 66 Ohio St.2d 340, syllabus, the Supreme Court of Ohio set forth the following test used to determine whether a trial court erred in denying a motion to sever charges for trial:
 {¶ 75} "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim. R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial."
 {¶ 76} In his motion in opposition to joinder, appellant argued that: (1) the presentation of different factual situations in different cases would confuse the trier of fact; (2) appellant's defenses to the different cases may be different; (3) certain evidence might not be admissible if the offenses were tried separately; (4) appellant's right to remain silent would be jeopardized if he elected to testify in defense of one discrete offense but not other offenses; and (5) appellant's right to be free from cruel and unusual punishment would be violated by joining his aggravated murder trial with other offenses.
 {¶ 77} The state correctly notes that when an appellant claims that he was prejudiced by the joinder of multiple offenses "a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." State v. Schaim, *Page 22 65 Ohio St.3d 51, 59, 1992-Ohio-31. Certainly, evidence regarding the recovery of the stolen weapon used in the murder would be admissible as it is a central focus in the Frankfort Road and Bryn Mawr offenses. Also, the same vehicle was used. Finally, the burglary offense stemmed from appellant's and the co-defendant's attempts at hiding the stolen guns which were linked to the Coley murder. Cf State v. Sandoval (Nov. 15, 1996), 6th Dist. No. S-95-055.
 {¶ 78} Appellant's next contention is that appellant would "likely" wish to testify as to the offenses in one indictment but not the other. Under Torres, supra, appellant is required to affirmatively demonstrate prejudice. A contention that his defenses to the offenses "may" be different does not meet the Torres standard. Based on the foregoing, we find that the trial court did not abuse its discretion when it denied appellant's motion in opposition to joinder.
 {¶ 79} Finally, appellant argues that he was prejudiced by the trial court's delay in ruling on the motion. We disagree. The joint trial date for the offenses was initially set in a March 2006 pretrial. Appellant first filed his motion in opposition to joinder on November 2, 2006, a mere 11 days prior to trial. Accordingly, because appellant had ample notice of the joint trial date and filed his motion close to that date, we find that appellant was not prejudiced by the timing of the court's ruling. Appellant's first assignment of error is not well-taken.
 {¶ 80} We will combine our discussion of appellant's second and third assignments of error, as they are related. Appellant's second assignment of error argues that the jury's *Page 23 
verdict as to aggravated murder, aggravated robbery, and burglary was against the manifest weight of the evidence. In appellant's third assignment of error he contends that the court erred in denying his motion for acquittal as to the murder, robbery, and burglary charges. Crim. R. 29(A) provides that the trial court shall enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus, "the test an appellate court must apply when reviewing a challenge based on a denial of a motion for acquittal is the same as in reviewing a challenge based upon on the sufficiency of the evidence to support a conviction." State v. Thompson (1998),127 Ohio App.3d 511, 525.
 {¶ 81} The Ohio Supreme Court has ruled that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52. "Sufficiency" pertains to a question of law as to whether the evidence is legally adequate, as to all the elements of the crime, to support a jury verdict. Id. Reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. However, under a manifest weight standard, an appellate court sits as the *Page 24 
"thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. Thompkins at 387. The appellate court, "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. While an appellate court may determine that a judgment is sustained by sufficient evidence, it may still conclude that the judgment is against the weight of the evidence. (Citations omitted.) Id.
 {¶ 82} We will first address the interrelated offenses of aggravated murder and aggravated robbery. With regard to appellant's aggravated murder conviction, R.C. 2903.01(B) and (F) provide:
 {¶ 83} "(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape.
 {¶ 84} "* * *.
 {¶ 85} "(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code."
 {¶ 86} Next, R.C. 2911.01(A)(2) states: *Page 25 
 {¶ 87} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 88} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * *."
 {¶ 89} Utilizing the above-quoted statutes, in order to find appellant guilty of aggravated murder, the state had to prove beyond a reasonable doubt that appellant purposely caused Coley's death while committing or attempting to commit an aggravated robbery. Appellant's defense at trial was that he went to the Coley residence to purchase marijuana and that because Coley brandished his weapon and appellant was in fear for his life, appellant shot him.
 {¶ 90} Upon review, we conclude that appellant's convictions were supported by sufficient evidence and that they were not against the weight of the evidence. Dante Boone testified that the three had gone to Coley's home to rob him. The evidence further demonstrated that Coley was shot through a closed door. (All three bullets went through the door.) Finally, there was testimony presented that Coley's holster was snapped shut.
 {¶ 91} Appellant next contends that his burglary conviction was not supported by sufficient evidence and was against the weight of the evidence presented at trial. R.C. 2911.12(A)(2) prohibits, "by force, stealth, or deception, * * * [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied *Page 26 
structure that is a permanent or temporary habitation of any person when any person * * * is present or likely to be present, with the purpose to commit in the habitation any criminal offense."
 {¶ 92} Appellant argues that there was ample testimony presented to demonstrate that he never entered the garage on Frankfort Road. Moreover, the gun recovered in the garage was Christopher Mason's, not appellant's. The state asserts that it was not necessary to prove that appellant entered the garage because he acted in complicity with Mason; the jurors were given the complicity instruction.
 {¶ 93} The parties' chief dispute was whether appellant entered the garage. (We note that Dante Boone did testify that he saw appellant go into the garage.) Stepping back, under R.C. 2911.12(A)(2), the state was first required to prove that appellant entered the garage by "force, stealth, or deception." It is undisputed that the attached garage was open so no force was required to gain entry. "Stealth" has been defined as `"any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission.'" State v. Ward (1993), 85 Ohio App.3d 537, 540, quotingState v. Lane (1976), 50 Ohio App.2d 41, 47. "Deception" is defined in R.C. 2913.01(A) as:
 {¶ 94} "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, *Page 27 
confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."
 {¶ 95} In State v. Pullen (June 25, 1992), 2d Dist. No. 91 CA 33, the court held that the appellant's act of entering an attached garage, in broad daylight, without evidence of stealth or deception to gain entry, was insufficient to support a burglary conviction. Accord State v.Isom (Nov. 29, 2001), 8th Dist. No. 78959. Distinguishable are cases where a defendant has entered an open, attached garage under cover of darkness (stealth), State v. Biddlecom (Apr. 6, 2000), 8th Dist. No. 76087; after "cruising" the neighborhood looking for open garages (stealth or deception); or purposely waiting until the garage was unoccupied, State v. Trikilis, 9th Dist. Nos. 04CA0096-M, 04CA0097-M (deception by an effort to avoid observation.)
 {¶ 96} In the present case, appellant drove directly up the driveway on Frankfort Road. It was daylight. The three jumped out and ran from the sheriff's deputy. When Mason and (possibly) appellant ran into the open, attached garage there is no evidence that they waited until the homeowner was out of eyesight or that they had any intent to deceive anyone in order to gain access into the garage. Apparently, Mason's and appellant's only intent was to hide their weapons from the officer. This intent is insufficient to prove the element of "force, stealth, or deception;" thus, the trial court erred when it denied appellant's Crim. R. 29 motion with regard to the burglary charge. The burglary conviction was also against the manifest weight of the evidence. *Page 28 
Accordingly, we find that appellant's second and third assignments of error are well-taken, in part.
 {¶ 97} In appellant's fourth assignment of error, he contends that the trial court erred when it failed to impose the minimum prison sentence. Appellant concedes that because appellant failed to raise these arguments at his resentencing, he has forfeited the issue on appeal. SeeState v. Payne, 114 Ohio St.3d 502, 2007-Ohio-4642.
 {¶ 98} Regardless, this court has rejected ex post facto, due process, and separation of powers challenges to post-State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856 sentencings where the court imposed a nonminimum sentence and where the sentences imposed ran consecutively. SeeState v. Coleman, 6th Dist. No. S-06-023, 2007-Ohio-448; State v.Barber, 6th Dist. No. WD-06-036, 2007-Ohio-2821. Accordingly, appellant's fourth assignment of error is not well-taken.
 {¶ 99} On consideration whereof, we find that appellant was prevented or prejudiced from having a fair trial, in part, and the judgment of the Lucas County Court of Common Pleas is affirmed, in part and reversed, in part. The judgment is reversed as to appellant's burglary conviction only and the matter is remanded for further proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART. *Page 29 
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., William J. Skow, J., CONCUR.
[1] Subsequently, the state entered a nolle prosequi as to one of the receiving stolen property counts.
[2] The indictments included co-defendant, Christopher Mason, who was tried separately. Mason was convicted of the lesser included offense of felony murder and aggravated robbery. On September 30, 2008, this court affirmed Mason's convictions but remanded the matter for a hearing on Mason's ability to pay various court costs. See State v. Mason, 6th Dist. No. L-06-1404, 2008-Ohio-5034. Mason was separately indicted on one count each of burglary and receiving stolen property. Pursuant to a plea agreement with the state, Mason entered no contest pleas. Dante Boone, a third defendant, entered into a plea agreement with the state in exchange for his testimony (discussed infra.)
[3] To avoid confusion, Rodney Coley Jr. will be referred to as "Rodney," and the victim will be referred to as "Coley." *Page 1