[Cite as *State v. Lewis*, 2024-Ohio-607.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                        Court of Appeals No.  OT-23-007

    Appellee                                     Trial Court No.  22CR080

v.

Herbert Lewis II                              **DECISION AND JUDGMENT**

    Appellant                              Decided:  February 16, 2024

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Alec Vogelpohl, Assistant Prosecuting Attorney, for appellee.

W. Alex Smith, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Herbert Lewis II, appeals the
January 9, 2023 judgment of the Ottawa County Court of Common Pleas convicting him
of aggravated burglary and two counts of domestic violence.  For the following reasons,
we affirm the trial court judgment.

## I. Background and Facts

**{¶ 2}** On May 4, 2022, Lewis was indicted on three counts: aggravated burglary, a violation of R.C. 2911.11(A)(1) and (B), a felony of the first degree, and two counts of domestic violence in violation of R.C. 2919.25(A) and (D)(4), felonies of the third degree. The charges arose from an incident on April 24, 2022, when Lewis entered the apartment of his ex-girlfriend, C.T., in Port Clinton, Ohio, and attacked C.T. and her eldest daughter, I.T.

**{¶ 3}** The case proceeded to a jury trial in November 2022, where the following witnesses testified for the state: C.T.; her eldest daughter, I.T.; David Niemeyer, a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"); and Officer Curt Cochran and Detective Sergeant Corbin Carpenter of the Port Clinton Police Department.

**{¶ 4}** C.T. testified first. C.T. explained that she and Lewis were in an on-and-off relationship for approximately seven years. They have one daughter together, L.L., who is five years old. C.T. also has two other daughters, L.N., who is seven years old, and I.T., who is eighteen. Lewis lived in C.T.'s apartment with C.T. and the three girls during the course of their romantic relationship. Although Lewis was not on the lease, he paid some of the bills and had a key to the apartment.

**{¶ 5}** In January or February 2022, C.T. and Lewis broke up by mutual agreement. At that time, Lewis moved out and stopped paying any bills for the apartment. Lewis went to live with his brother and his brother's ex-girlfriend in Lorain, Ohio. Although

2.

Lewis took his personal belongings with him when he moved out, C.T. later found some of his clothing in the laundry, as well as a pair of shoes, a "Perfect Pushup," and a few pairs of jeans in a closet. Lewis kept his key to the apartment after he moved out.

{¶ 6} After Lewis moved out, C.T. and Lewis continued to talk on the phone or video chat every day. They would discuss getting back together. Between the time that Lewis moved out (in January/February 2022) and the date of the incident (April 24, 2022), C.T. invited Lewis over to her apartment on two occasions, and he accepted both invitations. Lewis did not come over to the apartment at any other time, even though he still had a key.

{¶ 7} On Saturday, April 23, 2022, C.T. was on the phone with Lewis "all day" and was still on the phone with him into the early morning hours of April 24. They were talking about their relationship and the kids. In "the early morning hours," C.T. could tell that Lewis was intoxicated because his demeanor changed. Lewis became angry, started slurring his words, and acted jealous. Lewis accused C.T. of being with another man, and C.T. confirmed that she was, in fact, talking to another man. Lewis had C.T. video chat with him around 2:30 or 3:00 in the morning so that he could see who was in the apartment with her. C.T. thinks she fell asleep around 4:00 a.m. L.L. was in bed with her, and L.N. and I.T. were asleep in their rooms.

{¶ 8} C.T. woke up when someone in a mask started hitting her in her face, her ribs, and her back. She was hit three times while she was lying in bed. At some point L.L. woke up and looked at the masked person and said "dad." C.T. ran downstairs to the

3.

front door. As she was trying to unlock the "hotel lock," the masked person hit her again while she was cornered. I.T. appeared and pushed the person away. The person hit I.T. in the neck, and C.T. was able to open the front door.

{¶ 9} C.T. testified that by the time she was downstairs, she knew that the masked person was Lewis "by the way he stands." After he hit I.T., Lewis turned to leave out the back door, but turned around again to tell I.T. "he loved her and he'll never forget her." C.T. recognized Lewis's voice.

{¶ 10} C.T. said that after Lewis left "the police were there" and they took her report. Her mom came over and told her that her tires were slashed. C.T.'s tires were not slashed on the evening of April 23 when she parked the car.

{¶ 11} As a result of the attack, the left side of C.T.'s face was bruised. She did not go to the hospital for her injuries. She later discovered that her back kitchen window was broken and there was blood on the glass. Although she did not have any cuts on her, the shirt that she was wearing that night had blood on it. The police took the shirt for testing. The police also took the sheets from her bed, which also had blood stains.

{¶ 12} C.T. explained that she still loves Lewis, and took him back because he is "a really good dad and an excellent boyfriend" when he is not intoxicated.

{¶ 13} I.T. also testified at trial. She lives with her mother, C.T., and her two sisters. Lewis is her mother's boyfriend and she has known him for seven years. Lewis has lived with them for a "good chunk" of those seven years, but he moved out of the

4.

apartment approximately four months before the April 24, 2022 incident. I.T. does not remember seeing Lewis between the date he moved out and the date of the incident.

{¶ 14} I.T. woke up around 7:40 a.m. on April 24, 2022, when she heard her mom screaming downstairs. She ran downstairs, where she found her mom "and a man on her" up against the wall by the front door. The man was wearing boots, a heavy jacket, heavy pants, and a full facemask that only showed his eyes. I.T. pushed him off C.T., and then the man hit her "on [her] left side" with a closed fist. She did not have any physical marks after getting struck.

{¶ 15} I.T. did not think that it was Lewis at first, but she realized it was him when he said "I will always love you or something like that." I.T. is very familiar with his voice and can "positively" say that it was Lewis. When he turned to walk out the back door, I.T. picked up a bottle of air freshener that was on the TV stand and threw it at him as he was walking away. She later noticed blood on the floor in the area where Lewis and her mom were struggling.

{¶ 16} The state's next witness was David Niemeyer, a forensic scientist for BCI in Richfield, Ohio, in the DNA section. He has been with BCI for approximately 19 years. As a forensic scientist, he analyzes items of evidence submitted by law enforcement, collects any necessary stains, does DNA tests on the stains, prepares a report, and testifies if necessary. He explained his specialized training and experience in the field of DNA testing. Niemeyer has testified as an expert in DNA evidence

5.

approximately 60 times. Without objection from Lewis, the trial court determined that Niemeyer qualified to testify as an expert in the field of DNA evidence.

{¶ 17} Niemeyer explained that DNA stands for deoxyribonucleic acid, which is a long, string-like molecule found in every cell of the human body, and no two individuals (with the exception of identical twins) have the same DNA profile. He takes samples from the stains on the submitted evidence and compares to known samples, which are buccal or oral swabs, to include or exclude contributors.

{¶ 18} DNA analysis occurs in four steps. The first step is extraction. Basically, the lab takes the cells and breaks them apart. They then isolate and purify the DNA to get all the "extra stuff" they don't need out of the way. The second step is called quantification, which entails determining how much DNA is in the sample. The third step is amplification. At that point, they make millions of copies of the DNA so that it's suitable to run on their instruments because "you can't run just a tiny bit." After that, the last step is profiling, which involves obtaining the genetic profile from the instruments and printing the results.

{¶ 19} Niemeyer explained that when law enforcement brings evidence to BCI, the intake technicians will assign each case a unique case number, and the items are put into their locked vault which has fingerprint access for the scientists and supervisors. In this case, police submitted the following items for testing: C.T.'s shirt (item 1), a Lewis elimination standard (item 2), an L.N. elimination standard (item 3), a C.T. elimination

6.

standard (item 4), an I.T. elimination standard (item 5), a swab from the window ledge (item 6), and a swab from the back door (item 7).

{¶ 20} Niemeyer was the scientist assigned to test the items, and he prepared a report of his findings. He tested items 1, 4, and 6.

{¶ 21} Item 1, a cutting of C.T.'s shirt, contained a presumptive positive for blood, and the DNA profile generated was consistent with Lewis. The estimated frequency of occurrence of this DNA profile is greater than one in one trillion unrelated individuals. Niemeyer explained that even though L.L. is Lewis's biological daughter and lived in the apartment, the DNA profile could not have been consistent with L.L. because it was a male profile. In addition, C.T. was excluded as a contributor.

{¶ 22} Item 6, the swab of blood from the back door, contained the "exact same results" as Item 1.

{¶ 23} Next, the state called Officer Curt Cochran of the Port Clinton Police Department. On April 24, 2022, he was dispatched to a Port Clinton apartment around 7:30 in the morning because someone had broken in and assaulted both the caller and the caller's daughter.

{¶ 24} When Officer Cochran arrived at the apartment, he was met by the complainant, C.T., who informed him that her ex-boyfriend had broken in through a window, entered the residence, and woke her up by punching her in the face. She left the bedroom to get the fighting away from her four-year-old daughter, who was sleeping in

7.

bed with her. C.T. ended up downstairs, her oldest daughter tried to push him off of her, and the intruder punched the daughter in the neck area.

{¶ 25} When Officer Cochran entered front door, he could see directly into the kitchen, where "there was disarray." There was a table that was partially collapsed, broken glass, and a broken window. He then went outside to look around the house, and there was a screen "bent up and on the ground" outside the window. He noticed that there was a "little bit of blood" on the windowsill, and there was some blood on the floor of the kitchen as well. He went up to the bedroom and noticed there was blood on the sheets and on C.T.'s shirt. C.T. had some swelling over her left eye. Officer Cochran thought that she may be bleeding, but C.T. said that the blood was "from him when he broke in * * *." C.T. had no visible cuts and did not appear to be bleeding. He did not see any marks on I.T.'s neck where she says that she was hit.

{¶ 26} Finally, the state called Corbin Carpenter, a detective sergeant with the Port Clinton Police Department, as its last witness. On April 24, 2022, he was called to an apartment complex in Port Clinton, Ohio, to collect evidence and photograph the crime scene. When he pulled up, he noticed a car parked in front of the apartment building with four flat tires. He then spoke to other officers on the scene. Officer Cochran advised him that the subject had broken into the apartment, attacked the victim, and fled out the back door.

{¶ 27} Detective Carpenter went through and photographed the entire scene, including the upstairs, the master bedroom, the kitchen downstairs, the exterior of the

8.

building, and the point of entry. He also photographed C.T.'s injury to her face, and he photographed "a couple red marks" on I.T.'s neck where she said she was punched. He photographed C.T.'s blood-stained shirt, and C.T. confirmed that the stains were not there when she went to bed. He had C.T. change so that he could collect the shirt.

{¶ 28} He photographed the blood stains on the bed, and C.T. confirmed that the stains were new. He collected the sheet for testing.

{¶ 29} He collected a droplet of blood from the inner ledge of the windowsill, and C.T. confirmed that the blood was not there before she was attacked. He explained that it was a sliding window, the glass was broken out, and it appears that the perpetrator slid the window open and touched the side, where there was blood. He noticed that the back door in the kitchen was ajar, and there was blood on the edge of the door frame by the handle, and he swabbed that as well.

{¶ 30} Detective Carpenter collected DNA standards from C.T. and I.T., while Officer Cochran collected DNA standards from the two younger daughters. He also swabbed apparent blood stains from C.T.'s arms and neck.

{¶ 31} After he collected the evidence, he transported it to the station, where it was logged into a "temp locker." Later, he moved the evidence to the evidence room, where it was assigned to Shelf 11. He transferred seven of the items—the elimination standards, the blood droplets, and C.T.'s shirt—to BCI in Bowling Green for testing on June 2, 2022. Although he collected more evidence, he did not take everything to BCI because BCI will only process so many pieces at a time.

9.

**{¶ 32}** He testified that the evidence collected was consistent with entry through the window and exit through the back door. C.T. said the door was locked, and the blood being on the edge of the open door leads him to believe the blood was dropped after the door was opened and as the suspect was exiting.

**{¶ 33}** After Detective Carpenter testified, the parties stipulated that Lewis has two prior convictions for domestic violence. The state rested its case, and the defense moved for acquittal under Crim.R. 29. The trial court denied the motion. The defense did not put on any witnesses, and the matter was submitted to the jury for determination.

**{¶ 34}** The jury found Lewis guilty on all three counts. The trial court sentenced Lewis to the following prison terms: Count 1, aggravated burglary, a minimum term of seven years and a maximum term of ten and one-half years; Count 2, domestic violence, three years; and Count 3, domestic violence, three years. The trial court ordered the prison terms to run concurrently, for a total minimum prison term of seven years to a maximum prison term of ten and one-half years.

**{¶ 35}** Lewis now appeals and raises two assignments of error:

> I. Lewis was convicted of a violation of RC 2911.11(A)without legally sufficient evidence.

> II. Lewis was convicted of RC 2911.11(A), against the manifest weight of the evidence.

10.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 36} In his first assignment of error, Lewis argues that his conviction for aggravated burglary is not supported by sufficient evidence.

{¶ 37} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal quotation omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 38} Lewis was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), which provides, in relevant part, that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any

11.

criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]"

{¶ 39} On appeal, Lewis claims there was insufficient evidence that he entered the property "by force, stealth, or deception" because he still had a key to the apartment. He argues that "[o]ne cannot enter a property by 'stealth, force, or deception' when they are known to have a key to the property as a person with a key would be able to enter at any time." He claims that "[t]he fact that Lewis was wearing a mask and that he broke a window to enter the home is irrelevant" because "[w]hile admittedly a touch odd, a person could choose to enter their home through breaking a window rather than the door anytime they want."

{¶ 40} In response, the state argues there was sufficient evidence of "force" and "stealth" because Lewis entered the apartment by breaking a window, at night, wearing a ski mask. The state believes that Lewis is really arguing that there was insufficient evidence to support the element of trespass—i.e., Lewis implies that he had permission to enter the apartment because he had a key. The state argues that, despite retaining a key, Lewis no longer had custody or control of the apartment after he moved out, and the manner in which he entered—by breaking a window, at night, in a ski mask—was sufficient evidence by which a rational trier of fact could have concluded that he did not have permission to be there.

{¶ 41} We agree with the state that there was sufficient evidence of both "force" and "stealth" in this case. "Force" is "any violence, compulsion, or constraint physically

12.

exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Any force, however slight, is sufficient to establish the "force" element of aggravated burglary. *See Goins v. State*, 90 Ohio St. 176, 107 N.E. 335 (1914), syllabus (upholding burglary conviction when defendant further opened an already partially-open door to a chicken house). Obviously, then, "evidence of a broken window at a residence can establish the use-of-force element of burglary." *State v. Steen*, 2d Dist. Darke No. 2019-CA-16, 2020-Ohio-4598, ¶ 25, citing *State v. McClurkin*, 10th Dist. Franklin No. 11AP-944, 2013-Ohio-1140, ¶ 49 (a broken window "indicates the use of force" to gain entry to the property); and *State v. Brown*, 9th Dist. Medina No. 14CA0004-M, 2015-Ohio-640, ¶ 21, 24 (evidence that the victim's "window was broken from the outside and whoever broke the window left the window frame propped up against the wall * * *" was sufficient evidence that the defendant broke the window and entered the home).

{¶ 42} Here, police discovered that C.T.'s first-floor window had been broken, its screen was "bent up and on the ground" outside the window—suggesting that it was broken from the outside—and blood was found on the windowsill. This evidence is sufficient evidence that Lewis gained access to the apartment by "force."

{¶ 43} In addition, there was also sufficient evidence that Lewis entered the apartment by "stealth." "Stealth" is defined as "any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission." (Internal quotation omitted.) *State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 47, citing *State v. Harris*, 6th Dist. Lucas Nos. L-06-1402 and

13.

L-06-1403, 2008-Ohio-6168, ¶ 93; and *State v. Ward*, 85 Ohio App.3d 537, 540, 620 N.E.2d 168 (3d Dist.1993). Here, Lewis entered the apartment by breaking a window, at night, while wearing a full facemask—which certainly suggests that he was attempting to sneak into the apartment undetected and without being identified by C.T. or anyone else. This is sufficient evidence of entry by "stealth."

{¶ 44} Evidence of "force" *or* "stealth" would have been sufficient to satisfy the "force, stealth, or deception" element of aggravated burglary in this case. *See State v. Kirby*, 12th Dist. Butler No. CA2019-05-078, 2020-Ohio-4005, ¶ 30 ("The methods of trespass in the aggravated burglary statute—force, stealth, or deception—are written in the disjunctive, therefore the state only needed to prove one of the three methods."). Accordingly, we reject Lewis's argument that there was insufficient evidence to support this element of his aggravated burglary conviction.

{¶ 45} Finally, we agree with the state that Lewis has directed his arguments towards the wrong element of aggravated burglary—i.e., by claiming that he had permission to enter the apartment because he had a key, Lewis is really arguing that there was insufficient evidence that he "trespassed" on the property. We will therefore address that element as well.

{¶ 46} This case is analogous to *State v. Fields*, 8th Dist. Cuyahoga No. 90154, 2008-Ohio-5867. In *Fields*, the appellant and his wife were separated. He moved out of the family home (which they both owned) in April 2006, but he left some of his belongings behind. He also retained a set of keys to the house. Between April 2006 and

14.

October 22, 2006, the appellant entered the house on only one occasion, which was to care for the couple's injured son. On October 22, 2006, the appellant entered the home at 4:00 a.m. by forcefully kicking down the door. He threatened his wife, and she called the police. He was eventually convicted of burglary and aggravated burglary.

{¶ 47} The appellate court noted that "trespass" for purposes of both crimes means "to knowingly enter or remain in a structure or dwelling or building of another without authority, consent, or privilege to do so." (Internal quotation omitted.) *Id.* at ¶ 25; *see also* R.C. 2911.21(A)(1) (defining criminal trespass, as pertinent here, as "[n]o person, without privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another[.]"). The court then recognized that in *State v. Lilly*, 87 Ohio St.3d 97, 717 N.E.2d 322 (1999), the Supreme Court held that a "'spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling.'" *Fields* at ¶ 26, quoting *Lilly* at 100. The court relied on *Lilly* to find sufficient evidence of "trespass" because appellant's wife had been exercising exclusive custody and control over the family home, and there was sufficient evidence for a reasonable juror to conclude that he did not have permission to enter the house that night. *Id.* at ¶ 27. In particular, the court noted that "[t]here was testimony that appellant may have retained a set of keys to the house, but appellant did not use keys to enter the house. The fact that appellant entered the house by kicking in the exterior bedroom door in the middle of the night suggests a lack of consent." *Id.* at ¶ 28.

15.

{¶ 48} Similarly, here, there was evidence that C.T. exercised exclusive custody and control over the apartment. Indeed, Lewis was not on the lease and ceased contributing towards the bills when he moved out of the apartment. C.T. testified that between the time that Lewis moved out (in January/February 2022) and the date of the incident (April 24, 2022), Lewis had entered the apartment on only two other occasions and with her express permission. Although Lewis retained a key, he did not use his key to enter the apartment on April 24, 2022—he broke a glass window, late at night, and entered while wearing a full facemask. This is certainly sufficient evidence by which a reasonable factfinder could conclude that he did not have permission to enter C.T.'s apartment.

{¶ 49} Moreover, even if Lewis's retention of a key to C.T.'s apartment could somehow be interpreted to imply a "privilege" to enter as he did on the night of April 24, 2022, privilege can be revoked—explicitly or implicitly. It is well-recognized that a defendant's privilege to remain on one's property is implicitly—and immediately—revoked when the defendant commits a violent offense on the property. *State v. Steffen*, 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987). ("Under the circumstances of this case, even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in [the victim's] home terminated the moment he commenced his assault on her."); *see also Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, at ¶ 49 (any privilege that the defendant had to be inside the victim's home was revoked when he began raping the victim); *State v. Swiergosz*, 6th Dist. Lucas

No. L-12-1293, 2013-Ohio-4625, ¶ 18-19 (privilege revoked when defendant kidnapped the victim). Accordingly, any "privilege" that Lewis may have had to remain on the property was immediately revoked when he began assaulting C.T.

{¶ 50} For these reasons, we reject Lewis's arguments that his conviction for aggravated burglary was not supported by sufficient evidence, and we find Lewis's first assignment of error not well-taken.

### B. Weight of the Evidence

{¶ 51} In his second assignment of error, Lewis argues that his conviction for aggravated burglary is against the weight of the evidence.

{¶ 52} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

17.

**{¶ 53}** Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

**{¶ 54}** Lewis argues that his conviction for aggravated burglary is against the manifest weight of the evidence because he had a key to the apartment and he still had some belongings there. He argues that "[t]he fact that personal items were still in the house and the fact that he had a key are clear evidence that he was permitted to come and go at his leisure" and he claims that this evidence "appears to have been completely ignored by the jury."

**{¶ 55}** After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. The jury did not lose its way by concluding that Lewis committed aggravated burglary when he broke one of C.T.'s windows in the middle of the night, entered her apartment through the broken window wearing a full facemask, and assaulted C.T. and I.T., who were both sleeping inside the apartment. Even though Lewis retained a key to the property and still had some belongings there, the facts surrounding his late-night break-in are compelling proof that

18.

he was not privileged to enter as he did.  And, at the very least, any privilege he may have had was immediately revoked when he decided to beat C.T. in her sleep.

{¶ 56} For these reasons, Lewis's conviction for aggravated burglary is not against the manifest weight of the evidence, and Lewis's second assignment of error is not well-taken.

### III. Conclusion

{¶ 57} In sum, Lewis's two assignments of error are found not well-taken, and the January 9, 2023 judgment of the Ottawa County Court of Common Pleas is affirmed. Lewis is ordered to pay the costs of this appeal pursuant to App. R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.      _____
              JUDGE
Christine E. Mayle, J.

Myron C. Duhart, J.       _____
CONCUR.            JUDGE


              _____
              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.