**[Cite as *State v. Thomas*, 2026-Ohio-20.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                Court of Appeals No. {48}L-25-00049

    Appellee/Cross-appellant                    Trial Court No.  CR0202401945

v.

Coleman D. Thomas                                **<u>DECISION AND JUDGMENT</u>**

    Appellant/Cross-appellee                    Decided:  January 6, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee/cross-appellant.

Henry Schaefer, for appellant/cross-appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Coleman Thomas, appeals the February 14, 2025 judgment of the Lucas County Court of Common Pleas sentencing him to four to six years in prison.  For the following reasons, we affirm in part and reverse in part.

### I. Background and Facts

{¶ 2} Thomas was charged with one count of aggravated burglary in violation of R.C. 2911.11(A)(1), a first-degree felony.

{¶ 3} Thomas's case was tried to the court. At trial, the State presented the testimony of Toledo Police Department lieutenant Philip Cook, sergeant Jimmie Bennett, detective Timothy Langlois, and officers Bradley Knapp and Thomas Burzynski, and Toledo Fire Department captain Brian Gardner. Although I.H., the alleged victim, was properly subpoenaed, she did not appear at trial.

{¶ 4} Cook testified that he is responsible for retrieving 911 calls and call records. He presented the records of I.H.'s and I.H.'s mother's 911 calls from the morning of June 26, 2024. According to the incident detail report related to the calls, the two 911 calls came in at 2:09 and 2:14 a.m. The report also notes that officers were "TAKING ONE IN CUSTODY" at 2:19 a.m., and again notes that the suspect was taken into custody at 2:26 a.m.

{¶ 5} Thomas objected to the admission of the 911 calls on the basis that the statements in them were testimonial and neither declarant was available to be cross-examined at trial, in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution. The trial court overruled his objection.

{¶ 6} In the first 911 call that the State played for the court, after I.H. identifies herself, gives her address, and asks for someone to "please get here," she tells the operator that "he's here, in my house" and explains that "he busted [her] windows . . ." and said that he is not leaving. She also says that "he hit [her], he beat [her]" and her "head is lumped up." She identifies the assailant as Coleman Thomas, her children's father. She tells the operator that Thomas has a weapon but does not answer when the

2.

operator asks if it is a gun or a knife. Throughout the call, a man and woman are yelling in the background.

{¶ 7} In the second 911 call, the female caller asks for help to "please get here immediately" because "a man has broke in the house . . . ." She tells the operator that "the whole door fell down. The window out." When the operator asks if the person who broke in is still there, the caller responds, "he's going back and forth." After giving that answer, the caller begins yelling at a man whose voice can be heard in the background of the call, and she argues with the man for the rest of the call.

{¶ 8} Knapp was one of the officers who responded to the 911 calls from I.H.'s apartment. When he got to the apartment, the occupants told him that the suspect had fled. He and his partner began checking the area for the suspect for their and the victim's safety. They were told that a suspect was running away from the area, but they did not chase him. Other officers eventually apprehended the suspect—Thomas—about a block away from I.H.'s apartment.

{¶ 9} When Knapp got to the apartment, I.H. was "[h]ysterical" and in shock. He noticed that a sliding door was "completely off the hinges and laying inward into the apartment." Based on where the door was laying, Knapp believed that it was "forced from the outside to the in." The pictures that Knapp took of I.H.'s apartment and patio showed "property that was basically thrown about in the apartment that was laying on top of the door" and items on the patio that Thomas had knocked over. In Knapp's experience, this type of property destruction usually indicates some kind of struggle. Knapp also took a picture of a cut in the patio door screen because "there was possibly a

3.

knife involved, and it appeared that the screen was cut." Additionally, Knapp took pictures of a contusion on I.H.'s forehead.

{¶ 10} According to information that Knapp learned from other officers, Thomas went to the apartment because he wanted his fishing poles. The officers did not find fishing poles inside the apartment, but they did find some in a dumpster behind a carport outside of the apartment.

{¶ 11} On cross-examination, Knapp said that he did not look around the apartment to see if any property belonging to a man or any mail addressed to Thomas was there. Although Knapp had a theory about how the door ended up inside of the apartment, he did not know how the door actually got there. Similarly, he did not know how the items on top of the door and on the patio ended up in their locations, how the patio screen got slashed, or when or how I.H.'s forehead was injured.

{¶ 12} Gardner testified that he responded to an assault at I.H.'s apartment. According to the incident report from the run, I.H.'s chief complaint was an assault with bodily force that caused a head injury. Specifically, I.H. had a bump on her forehead that the EMTs treated with an ice pack to reduce the swelling. I.H. was upset and "[l]ooked like she had been in an altercation." I.H. declined Gardner's offer to take her to the hospital.

{¶ 13} On cross, Gardner testified that he did not see any bruising on I.H., but "she was a darker complected woman. It is tough to tell in that short of a time span." He did not know if the existence of swelling on I.H.'s forehead was later confirmed by a doctor.

4.

{¶ 14} Burzynski testified that he was one of the officers who responded to I.H.'s and I.H.'s mother's 911 calls. He arrived at I.H.'s apartment around 2:00 a.m. After getting a description of Thomas and learning which direction he ran, Burzynski searched for him but ultimately did not find him.

{¶ 15} Once Thomas was in custody, Burzynski went back to I.H.'s apartment. I.H. was "hysterical, kind of yelling and screaming." He saw an injury on I.H.'s forehead. She was holding an ice pack on her forehead and kept her head down. Inside the apartment, he saw "[t]he sliding glass door on the floor and stuff strewn about the apartment."

{¶ 16} On cross, Burzynski testified that he was unsure whether one of the pictures pulled from his body camera video showed a duffle bag on the floor. There appeared to be shoes in one of the photos. Other than I.H.'s statement that the door was "kicked in," Burzynski had no way of knowing whether the door ended up on the floor accidentally or intentionally.

{¶ 17} Burzynski looked through the whole apartment but did not look for male clothing, duffle bags, mail addressed to Thomas, or anything else that would indicate that Thomas lived at the apartment.

{¶ 18} Bennett also responded to I.H.'s apartment the night of the incident. As a sergeant, he does not usually respond to domestic violence incidents but he decided to respond to this one "based off the [911] call text saying that the [suspect] had a knife, and that there was screaming going on in the background."

5.

{¶ 19} After going to the apartment and talking to I.H., Bennett and two other crews began looking for Thomas. One of the other crews saw Thomas and tried to apprehend him, but he fled from them. Bennett saw Thomas fleeing from the other crew, chased him, and took him into custody. Thomas was initially "a little hesitant" when Bennett tried to apprehend him, but he complied "after a few orders of [Bennett] telling him to get on the ground . . . ." Thomas was "very agitated" when Bennett took him into custody. He told Bennett that he was at the apartment to get his fishing poles. There were fishing poles found outside at the apartment complex.

{¶ 20} On cross, Bennett testified that Thomas did not have a knife on him when Bennett arrested him, and Bennett did not find a knife anywhere near Thomas.

{¶ 21} Thomas was "[f]airly" compliant when Bennett caught up to him. He was attempting to jump a fence, but he stopped when Bennett got his taser out.

{¶ 22} When Bennett was inside the apartment, he did not look for a knife. He did not see any items belonging to a male.

{¶ 23} Langlois, the detective assigned to this case, testified that he got to I.H.'s apartment about an hour after I.H.'s and I.H.'s mother's 911 calls. He noticed that her "door was inside the apartment" and that there were "a couple things knocked off, but there was no other damage [he] saw."

{¶ 24} Langlois personally delivered a subpoena for trial to I.H. the week before trial. In his experience, it was sometimes difficult to get witness cooperation in domestic violence cases because of fear.

6.

{¶ 25} Langlois interviewed Thomas as part of his investigation. In his interview, Thomas told Langlois that he lives in Detroit and stays with his brother on Rogan Way when he is in Toledo to visit his children. He explained that he and I.H. "got into it all the way from" I.H.'s sister's house near Rogan Way to I.H.'s apartment. I.H. left him and made him walk. He went to I.H.'s apartment to "get [his] shit." As he was trying to leave, they "got into a scuffle" because she was mad that he wanted to go back to Detroit. He also explained that I.H.'s patio door came off very easily. Beyond that, Thomas said, "I'm not going to say what happened, bro, because I'm not about to incriminate my wife . . . we got into it, bro. We got into it. That's all I'm going to say. She did what she did. I did what I did, bro."

{¶ 26} Of the things that Thomas said in his interview, Langlois found it significant that he admitted that he did not live at I.H.'s apartment. He also noted that Thomas said, "I did what I did, and she did what she did." The fishing poles that Thomas talked about were found behind some dumpsters about 100 to 150 yards away from the apartment.

{¶ 27} On cross-examination, Langlois testified that Thomas said that he brought the fishing poles down from Detroit in a U-Haul.

{¶ 28} Langlois never considered that Thomas might have been invited into I.H.'s apartment.

{¶ 29} After Langlois's testimony, the State rested.

{¶ 30} Thomas moved for acquittal under Crim.R. 29 because there was no direct evidence that Thomas was in I.H.'s apartment. Beyond that, Thomas told Langlois in his

7.

interview that he stays at the apartment sometimes, and there was no evidence of his permission to be in the apartment being revoked. Additionally, he claimed that it was clear from the evidence that Thomas went to I.H.'s apartment to reclaim his property, not with the intent to cause harm or commit a crime. In response, the State pointed to I.H.'s 911 call, in which she named Thomas and told the operator that he busted her window, he beat her, and she was scared. It also noted that her door was pushed in from the outside. The trial court denied Thomas's motion.

{¶ 31} Thomas did not present any evidence.

{¶ 32} The court found Thomas guilty of aggravated burglary. It sentenced him to four to six years in prison. At the sentencing hearing, the trial court told Thomas that he would be subject to a mandatory term of postrelease control of two to five years upon his release from prison and the consequences of violating postrelease control.

{¶ 33} In its sentencing entry, regarding postrelease control, the trial court stated,

> Defendant notified of post-release control as follows: Felony Sex Offense: 5 years mandatory; F-1: 2-5 years mandatory; F-2: 18 months-3 years mandatory; F-3 (offense of violence, R.C. 2901.01(A)(9)): 1-3 years mandatory; F-3 (other): up to 2 years discretionary; F-4: up to 2 years discretionary; F-5: up to 2 years discretionary. Defendant further notified that if post-release control conditions are violated, the adult parole authority or parole board may impose a more restrictive or longer control sanction or return Defendant to prison for up to nine months for each violation, up to a maximum of 50% of the minimum stated term originally imposed. Defendant further notified that if the violation is a new felony conviction, Defendant may be both returned to prison for the greater of one year or the time remaining on post-release control, plus receive a prison term for the new felony (-ies).

8.

**{¶ 34}** Thomas now appeals, raising two assignments of error:

      I. The trial court erred in admitting the 911 calls (State's Exhibit 1) containing out-of-court statements by the alleged victim, I.H., and her mother, in violation of the Defendant-Appellant's Sixth Amendment right to confront witnesses against him, as the statements were testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004), and the declarants were unavailable for cross-examination.

      II. The trial court's finding of guilt for aggravated burglary under R.C. 2911.11(A)(1) was against the manifest weight of the evidence, as the greater weight of credible evidence does not support the conclusion that Coleman Thomas trespassed into the apartment with the intent to commit a criminal offense and inflicted physical harm.

**{¶ 35}** Additionally, the State filed a cross-appeal relating to Thomas's sentence:

      Although at sentencing the trial court properly notified Appellant/Cross-Appellee Coleman Thomas that his conviction for aggravated burglary, a felony of the first degree, included a mandatory term of post-release control ("PRC") of 2 to 5 years, the February 11, 2025, sentencing entry (e-filed February 14, 2025) only listed the possible ranges of PRC terms associated with the various felony degree levels. As such, the State submits that the trial court did not properly notify Thomas of the term and nature of PRC in this case. Remand with instructions to issue a nunc pro tunc entry is therefore necessary to address this limited issue.

## II. Law and Analysis

### A. Admission of the 911 calls did not violate Thomas's right to confront witnesses.

**{¶ 36}** In his first assignment of error, Thomas argues that the trial court violated his right to confront the witnesses against him by admitting the 911 calls by I.H. and her mother. He contends that the statements in the calls were testimonial because they described past events and served to document evidence for prosecution instead of addressing an immediate threat. Further, he claims that the statements were inadmissible because I.H. and her mother were unavailable to testify at trial and he did not have a prior opportunity to cross-examine them about their statements. He also contends that the trial

9.

court's error was not harmless, and that the State's reliance on hearsay exceptions for the admissibility of the statements does not cure a Confrontation Clause violation.

{¶ 37} The State responds that the statements in the 911 calls are not testimonial because they were made before Thomas was apprehended and while he was still in the apartment posing a threat to the apartment's occupants. It also argues that the statements fall within the present sense impression and excited utterance hearsay exceptions in Evid.R. 803(1) and (2), so the trial court properly admitted them.

{¶ 38} The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless [she] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." "[T]he proper analysis for determining whether out-of-court statements violate the Confrontation Clause is . . . whether they are testimonial in nature." *Toledo v. Sailes*, 2008-Ohio-6400, ¶ 13 (6th Dist.), citing *Crawford* at 61. We conduct a de novo review of evidentiary rulings that implicate the Confrontation Clause. *State v. McKelton*, 2016-Ohio-5735, ¶ 97.

{¶ 39} Whether the admission of a recording as evidence at trial violates the Confrontation Clause depends on whether the recorded statements are testimonial or not. *State v. McMillion*, 2025-Ohio-5304, ¶ 19 (6th Dist.). That is, the admission of a recording containing testimonial statements without the opportunity for cross-

10.

examination violates the Confrontation Clause; the admission of nontestimonial statements does not. *Id.* Statements are testimonial if the witness made them with the reasonable belief that they will be used at a trial. *In re D.K.*, 2009-Ohio-6347, ¶ 20 (6th Dist.). Statements are nontestimonial if the witness made them to enable the police to assist during an ongoing emergency. *State v. Williams*, 2013-Ohio-726, ¶ 6 (6th Dist.). To determine whether a statement is testimonial or nontestimonial, we use the "primary purpose" test, which provides:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*State v. Costilla*, 2024-Ohio-3221, ¶ 30 (6th Dist.).

{¶ 40} Therefore, whether statements are testimonial or nontestimonial depends on whether they were made to seek assistance during an ongoing emergency. Whether an emergency exists and is ongoing "'is a highly context-dependent inquiry.'" *State v. Stevenson*, 2023-Ohio-4853, ¶ 62 (6th Dist.), quoting *Michigan v. Bryant*, 562 U.S. 344, 363 (2011). When deciding whether evidence is testimonial or not, a court must consider "'the statements and actions of both the declarant and interrogators . . . .'" *State v. Jones*, 2012-Ohio-5677, ¶ 155, quoting *Bryant* at 367. Generally, "[a] 911 call to report an ongoing emergency, with statements made contemporaneously with the emergency to request police assistance, are not testimonial statements for Sixth Amendment purposes."

11.

*Costilla* at ¶ 35; *State v. Wilcox*, 2024-Ohio-5719, ¶ 12 (lead opinion), citing *Davis v. Washington*, 547 U.S. 813, 818, 827-828 (2006).

{¶ 41} In this case, it is apparent that the 911 calls were made for the purpose of seeking help during an ongoing emergency. In her call, I.H. explained that Thomas "busted [her] windows," was in her house, had a weapon, had hit her and beaten her, and would not leave. She requested that someone "please get here." There is a man yelling in the background of the entire call. Similarly, in the second call, the caller tells the operator that a man has broken into the house, the door fell down and the window is out, and the man is "going back and forth." She asked for help to "please get here immediately." The caller spends a portion of the call yelling at a man whose voice is heard in the background. These facts show (1) an emergency—a man breaking into the apartment, possibly with a weapon; (2) that the emergency was ongoing—the man was still in the apartment; and (3) that the 911 calls were made to obtain police assistance. Thus, the primary purpose of the statements in the 911 calls was to seek help during an emergency, so the statements were not testimonial. *Costilla* at ¶ 35. Because the statements were not testimonial, the trial court did not err by admitting the 911 calls. Therefore, Thomas's first assignment of error is not well-taken.

**B. Thomas's conviction is not against the manifest weight of the evidence.**

{¶ 42} In his second assignment of error, Thomas argues that his conviction is against the manifest weight of the evidence because the State failed to present credible evidence supporting every element of the offense. He contends that the trial court's reliance on circumstantial evidence and dismissal of evidence showing that he had

12.

permission to be in the apartment created a manifest miscarriage of justice. The State responds that Thomas's conviction is supported by the weight of the evidence because it established the elements of aggravated burglary beyond a reasonable doubt.

{¶ 43} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *id.* at 387. Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 44} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 45} Thomas was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), which provides, in relevant part, that "[n]o person, by force, stealth, or

13.

deception, shall trespass in an occupied structure . . . when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense, if . . . [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]"

{¶ 46} Thomas challenges the weight of the evidence related to the trespass, purpose to commit a criminal offense, and physical harm elements of aggravated burglary, as well as the overall strength and quality of the State's evidence.

{¶ 47} "Trespass," occurs when a defendant, without privilege to do so, knowingly enters or remains on the land or premises of another. R.C. 2911.21(A)(1). A person acts "knowingly," regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A person has knowledge of circumstances when he is aware that such circumstances probably exist. *Id.* If a defendant's presence at the property is initially lawful, a trespass may nonetheless occur if the defendant's privilege is revoked or terminated. *State v. Roberson*, 2017-Ohio-4339, ¶ 49 (6th Dist.). A defendant's privilege is revoked when he commits a criminal offense inside the home. *Id.*

{¶ 48} Here, the evidence—in the form of I.H.'s and I.H.'s mother's 911 calls— showed that Thomas was in or remained in I.H.'s apartment without privilege to be there. The fact that Thomas "busted [her] windows" and "the whole door fell down" as he entered the apartment indicates that he was not entering the home with permission. *See State v. Lewis*, 2024-Ohio-607, ¶ 48 (6th Dist.) (breaking a window to enter an apartment at night is evidence of lack of permission). Even assuming that Thomas initially had

14.

permission to be in the apartment, his permission was revoked as soon as he began assaulting I.H., as evidenced by her report to the 911 operator that "he hit [her], he beat [her]" and her "head is lumped up." Thomas was in the apartment during the 911 calls, which were made after he had assaulted I.H., so—at the very least—he remained in the apartment after his privilege to be there was revoked by his assault on I.H.

{¶ 49} To prove the defendant had a "purpose to commit a criminal offense," the State must show that the defendant invaded the building specifically to commit a crime or formed the intent to commit a crime during the course of a trespass. *State v. Fontes*, 87 Ohio St.3d 527 (2000), syllabus. A defendant has purpose in two scenarios: (1) when it is his specific intention to cause a certain result; and (2) when the offense prohibits certain conduct, it is the defendant's specific intention to engage in that conduct, regardless of what he intends to accomplish. R.C. 2901.22(A). Intent can rarely be proven by direct evidence, but it can be inferred from the facts and circumstances surrounding the case. *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998).

{¶ 50} The facts and circumstances surrounding the break-in show that Thomas formed the intent to assault I.H. during the course of trespassing in her apartment. A person commits assault when they knowingly cause or attempt to cause physical harm to another. R.C. 2903.13(A). While Thomas was in I.H.'s apartment without privilege to be there, he "hit" and "beat" I.H. It is reasonable to infer from Thomas's demeanor during his interview and his admission to Langlois that he and I.H. had been arguing that evening that he was angry with her and, from that, it is also reasonable to infer that Thomas specifically intended to cause I.H. physical harm while he was in her apartment.

15.

{¶ 51} "Physical harm" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). Swelling and bumps are physical harm. *See City of Toledo v. Manning*, 2019-Ohio-3405, ¶ 35 (6th Dist.); *State v. Hopkins*, 2019-Ohio-522, ¶ 11 (5th Dist.). The evidence supports a finding that Thomas caused I.H. physical harm. I.H. reported to the 911 operator that Thomas beat her, and the responding officers and EMT testified to seeing a contusion, bump, and swelling on I.H.'s forehead. The testimony of one witness, if believed, is enough to support a conviction. *State v. Sherman*, 2024-Ohio-5354, ¶ 172 (6th Dist.). The trial court clearly believed I.H.'s report that Thomas caused the injury to her forehead and the first responders' reports of seeing an injury, and we must defer to the trial court's credibility findings.

{¶ 52} In sum, after carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. The trial court did not lose its way by convicting Thomas of aggravated burglary. Therefore, Thomas's conviction is not against the manifest weight of the evidence, and his second assignment of error is not well-taken.

### C. The sentencing entry fails to properly notify Thomas of postrelease control.

{¶ 53} In its cross-assignment of error, the State argues that the trial court failed to properly notify Thomas of the term of postrelease control he is facing when he finishes his prison term because the trial court's sentencing entry lists the ranges of possible postrelease control terms associated with different levels of felonies, as opposed to

16.

stating that Thomas is subject to a mandatory term of two to five years of postrelease control for his first-degree felony conviction. Because the court told Thomas of the proper postrelease control term at his sentencing hearing, the State contends that the court's error can be corrected with a nunc pro tunc entry. Thomas responds that the trial court's sentencing entry included the proper postrelease control term for a first-degree felony, so any error in including extra information is harmless. He also argues that the State waived its right to challenge the postrelease control notification by failing to raise it at or after the sentencing hearing, and any error does not rise to the level of plain error.

{¶ 54} As an initial matter, we do not find that the State forfeited its right to raise the issue of postrelease control notification. The trial court properly notified Thomas of postrelease control at the sentencing hearing, so the State would not have known of any notification issues at that time. Nor would it have known of any issues with the sentencing entry before the court finalized and issued it. Additionally, "[a]n attack on a trial court's imposition of postrelease control in a sentence must be brought on direct appeal or it will be barred by res judicata. . . . This holding applies to the State as well as the defendant." *State v. Bates*, 2022-Ohio-475, ¶ 32. In short, the State followed the proper procedure by filing its cross-appeal.

{¶ 55} Turning to the postrelease control notification in Thomas's sentencing entry, we find that the trial court erred by failing to notify Thomas of the term of postrelease control that it imposed at the sentencing hearing. When a trial court imposes a prison term on a defendant, it is required to notify the defendant at the sentencing hearing about postrelease control and is required to incorporate that notice into its

17.

sentencing judgment entry. *State v. Jordan*, 2004-Ohio-6085, ¶ 17. The notice the court incorporates into its sentencing entry must reflect the notice that it gave the defendant at the sentencing hearing. *State v. Qualls*, 2012-Ohio-1111, ¶ 19. When a defendant is notified about postrelease control at the sentencing hearing, but that notification is not properly reflected in the sentencing entry, the omission can be corrected with a nunc pro tunc entry. *Id.* at ¶ 24.

{¶ 56} Here, the trial court correctly told Thomas at his sentencing hearing that he will be subject to a mandatory two-to-five-year term of postrelease control upon his release from prison. The sentencing entry, which lists all possible terms of postrelease control, does not reflect the notice that the court gave Thomas at the sentencing hearing. Moreover, we have previously determined that this type of postrelease control notification in the sentencing entry is clearly and convincingly contrary to law. *State v. Whitney*, 2025-Ohio-4978, ¶ 20 (6th Dist.). Because the trial court did not properly notify Thomas of postrelease control in the sentencing entry, we must reverse and remand this case for the limited purpose of entering a nunc pro tunc entry that includes only the postrelease control term applicable to Thomas. Therefore, we find that the State's cross-assignment of error is well-taken.

### III. Conclusion

{¶ 57} For the foregoing reasons, the February 14, 2025 judgment of the Lucas County Court of Common Pleas is affirmed in part, reversed in part, and remanded for the limited purpose of entering a nunc pro tunc judgment entry that includes only the

18.

term of postrelease control applicable to Thomas. Thomas is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed, in part,<br>reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.                                        _____
<br>                                                          JUDGE

Christine E. Mayle, J.                                  _____
<br>                                                            JUDGE

Charles E. Sulek, J.
<br>CONCUR.
<br>                                                       _____
<br>                                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.